# Wheeling.

SMITH *et ux.* v. PATTON *et ux.*

Decided March 30, 1878.

1878.
Special Term.

1. A contract in writing, whereby the contractor agrees to purchase a particular tract of land, and executes a mortgage thereon to secure a debt, creates an equitable lien on such land when purchased, which a court of equity will enforce against the contractor and against volunteers and purchasers with notice.

2. If such contractor renders such equitable lien unavailing by executing a mortgage on such land in favor of a party having no notice of such equitable lien, such conduct would not justify a court in charging any other lands of the covenantor with such debt.

3. A contract in writing, whereby the contractor agrees to apply the proceeds of a particular tract of land, or any portion thereof, to the payment of a debt, or whereby the contractor agrees to apply the rents and profits of a particular tract of land, or any portion thereof, to the payment of a debt, creates an equitable lien on such land, or such portion thereof, which a court of equity will enforce against volunteers and purchasers with notice.

4. The uniting a purely legal demand in a bill which seeks the enforcement of an equitable demand, will not render the bill liable to be dismissed as multifarious.

5. A bill is filed to enforce the payment of the balance due on a final settlement of all accounts between the plaintiff and defendant, which is evidenced by a contract reciting such settlement in full. The answer admits the settlement, but alleges that it was made by the defendant in ignorance of the existence of certain accounts against the plaintiff, and which accounts were not included in the settlement. This is denied by the replication; no proof is taken in the cause. The court ought not to refer the cause to a commissioner to settle the accounts between the parties prior to the date of such settle-

ment, but should render a decree for the amount due by such settlement, without making such order. And if such decree be rendered and the defendant files a petition for a rehearing of the cause on the ground that he had been advised by his counsel that the court would make such order of reference without any proof being taken of the allegations in his answer, and that the petitioner under such advice, failed to take such proof, though he could if opportunity was offered prove the truth of such allegation, the court ought to refuse to re-open such decree on such petition.

6. When land is purchased and paid for by two persons, and the conveyance is made to one of them only, the law will raise a resulting trust for the benefit of the other to the extent of his interest. And such joint purchase and part payment may be proven by parol evidence, but to establish such a resulting trust, the evidence should be clear.

Upon the petition of Robert Patton and wife, an appeal from, and *supersedeas* to, several decrees of the circuit court of Kanawha county, rendered in a cause in which Nicholas Smith and wife were plaintiffs, and said Patton and wife, and Albert G. Pendleton, were defendants, were allowed by the court:

Hon. Joseph Smith, Judge of the seventh judicial circuit, rendered the decree complained of.

The following statement of the case is furnished by GREEN, PRESIDENT.

Nicholas Smith and Eliza P. Smith, his wife, filed their bill in the circuit court of Kanawha county, against Robert Patton and Nancy, his wife, and Albert G. Pendleton. The bill alleged that in October, 1868, Nicholas Smith and Robert Patton, agreed with Stephen P. Capehart for the purchase of a tract of land in said county of one hundred and eighty-five acres. This land was bought by them for the sum of $8,000.00, and for the purpose of re-sale in lots as a speculation, it being located on the Chesapeake and Ohio Railroad, and adjoining the growing town of Coalsmouth. That for the convenience of

making re-sale and for other reasons not stated, the

written contract of purchase from Capehart was made to Patton alone, though the purchase was for the equal benefit of Patton and Smith, who were to occupy the property jointly and divide equally the rents, issues and profits of re-sale. The first payment on the property was to be made on June 15, 1869, and was to be $2,000.00, and at that time Smith paid his half thereof. Patton did not pay his half of this $2,000.00, till compelled to do so by suit. That under this contract Smith and Patton took possession of this land and Smith advanced $400.00 for the improvement and working of the farm, and $300.00 for the support of their families who lived together on the property. Patton advanced no money. That the first crop raised was worth at least $800.00; but it was all levied on and sold under an execution against Patton. Under these circumstances Smith concluded to withdraw from the transaction and sell out to Patton, which he did on April 23, 1870; when a complete settlement was made of all their mutual dealings and transactions to that time, their respective wives also signing this contract, and they, Smith and wife, selling to Patton all their interest in said real estate and all other property owned by them jointly with a few specified exceptions of personal property. A copy of this contract is filed with the bill. It is lengthy and its language is generally inappropriate and ungrammatical. But though so badly drawn its meaning can be made out with sufficient certainty to make it not void for uncertainty. It fails to state that this Capehart farm was owned by Smith and Patton jointly or to show distinctly in what property Smith surrendered all his interest, its language on this point is: "In this contract it is expressly understood that all the property, rights and privileges that Smiths have or had to any sort of property *acts* notes *shown* in action, except the following reservation, viz: all the furniture that is known as Smith's, at the time Smith landed on the Kanawha river, at the time they

came into Capehart's house, and no other property and balance of every sort of property, whether it was owned by Patton as partnership, or on Patton's own, is to and now is surrendered with all rights and privileges thereunto : this embraces a mower, cider-mill, cow, hogs, &c., everything mentioned or enumerated." The meaning of this would seem to be, that Smith assigned to Patton all his interest in all sorts of property owned by them in common, excepting the furniture Smith brought with him when the two families commenced living together in the Capehart house, but there is no designation of what constituted this common property. The consideration for the obligation of Patton and wife, to pay the $4,500.00, is thus stated : "In consideration of love and affection for many kind acts and doings done by said Smith, to said Patton, for several years after the war, for money used by Smith to Patton, and further consideration of $1.00 in hand paid, receipt acknowledged, said Pattons agree and bind themselves to pay to said Smiths or their assignors, or representators, the sum of $4,500.00." The contract on its face shows clearly, that it was entered into as a complete settlement of all transactions between the parties up to its date. Its language on this point is : "It is agreed and sanctioned by both parties, themselves being present, signing the same, that this is understood to embrace all legal and moral obligations existing, or before this did exist between Smiths and Pattons, and they all declare they are satisfied with the settlement, and there is nothing left out that can hereafter be brought in, than is here embraced by the terms of this contract." And again the concluding words of the contract are, "Now burn all acts, notes and papers and let this be final settlement." With refference to the $4,500.00, it clearly appears from the contract that Patton, agreed to procure from one Bowyer to whom Patton had sold a tract of forty and one-half acres of land, a deed of mortgage, or to repurchase this land and make himself a mortgage to Mrs. Eliza P. Smith, to

secure the payment within one year of $3,000.00, a portion of the $4,500.00; for the residue, $1,500.00 Patton and his wife executed to Mrs. E. P. Smith, their bond payable November 15, 1871. The payment of this as also of the whole $4,500.00, is further secured in this language, "Patton agrees to pay one-half of all Patton's receipts of sale of any property as fast as he can sell and hand over half of each amounts of receipts to Smith, after he, Patton, satisfies a debt he, Patton, owes to S· P. Capehart, under a decree for $7,000.00, and all costs and interest therein embraced, and all such monies received by Smith, is to be credited on any part of the obligation in any shape as Smith may direct, or caused to be placed to the payment of the $4,500.00." And in another part of said contract there is this language, "it is understood, that Patton claims and will use every exertion to secure the growing crop, according to the terms made with the various tenants, with Mr. Bowyer, through N. Smith as his agent, and whatever may be saved or collected out of any thing on growing land, Patton then agrees to divide and turn over one-half of this to Mrs. E. P. Smith and family, or her assignee for their own use and benefit, be it small or large, but only to the half amount that Patton recovers." And again, "the parties are all at liberty to act as they choose, and keep correct accounts and settle up once in each month, by vouchers on both sides; and Pattons have control over and above that of Smiths, until Patton causes the deed to be made to Mrs. E. P. Smith, or her order and pay the $1,500.00 note ; after that Pattons claims their privilege under this contract, as a clear and complete payment and settlement between the parties; the note of $1,500.00 is to be paid inside of — and the 15th of November, 1871; but to be sooner if Pattons can sell and collect and then divide as before mentioned." These provisions of this contract freed of all their verbiage provide, that as a further security for the payment of the $4,500.00, after the satisfaction of the Capehart

lien for the purchase money, Patton shall as soon as possible sell off portions of this Capehart land, and that one-half of the proceeds of each sale shall be applied to the payment of this $4,500.00, and that till it is paid off, Patton and Smith shall remain in the joint occupation of the farm, each party taking one-half of the rents and profits of the land. With reference to their future living together, and the obligations of Patton in reference to the indebtedness of Smith and Patton, the contract provides: " Pattons are to pay all the expenses of R. Patton's traveling and hotel bills, &c., and neither party is to pay the other party for any labor or service rendered, except by agreement hereafter to be made, but the family table expenses are to be equally met and settled every month as best they can. All public sales made, and deeds of trust and accounts now unsettled between Webb, O. W. Byrum, Parsons Bowyer, Oliver A. Patton, and world in every shape, is to be paid by Pattons; and Pattons are to take and receive all claims and all property of every description, and Smiths is to pay their own *contracting,* and Pattons to pay theirs, each claiming their own according to the foregoing agreement. It is policy, proper and agreed, that *either* parties will aid all they can, as they have done, in their respective interests; and for family supplies, use the name of either to accomplish this purpose." This contract was signed by Smith and wife, and by Patton and wife.

The bill alleges that though Patton afterwards obtained from Bowyer a deed for said forty and one-half acres of land, yet in fraud of Smith that he had encumbered this land by mortgages beyond its value, instead of executing a mortgage on it according to his contract to secure $3,000.00 of said $4,500.00. The bill further alleges that Capehart, in a suit against Patton to enforce his vendor's lien on said one hundred and eighty-five acres of land, had obtained a decree and sold about one-half of it for $9,811.00, to be applied first to the payment of this lien, and the residue to certain judg-

ments against said Patton. That Smith, under said contract, had sold one-half of the crop of 1870, but no portion of the crop of 1871, the whole of which had been sold by Patton. This crop is alleged to be worth $1,000.00. The bill alleges that a piano of the plaintiff, Smith, worth $150.00 and reserved to him by this contract, had been sold by the sheriff under an execution against Patton, which he claims he Smith has a right to recover of Patton. And also the mutual accounts made by the parties in living together after this contract was made pursuant to it, involved controversies which were referred to arbitrators for settlement, who found due on that account to the plaintiff, Smith, from defendant, Patton, $67.89¼, for which he also claims a decree. The bill also alleges, that on January 20, 1871, Robert Patton fraudulently sold said Capehart land to one Albert G. Pendleton to delay, hinder and defraud his creditors, for the pretended consideration of $20,000.00, and that this deed is fraudulent on its face. A copy of the deed is filed. It purports that for and in consideration of $20.000.00 to be paid in eighteen installments of from $500.00 to $2,000.00, extending over ten years, Robert Patton conveyed to A. G. Pendleton, said Capehart farm, excepting three hundred and one-half acres, together with all the personal property upon the said farm. And it was agreed that if Patton should repay to Pendleton in five years after the last bond is paid the $20,000.00, and interest, said Pendleton was to reconvey the land to Patton. And it was further agreed that Patton might lay off and sell such portion of the land as he might elect, the proceeds to be applied to the payment of the $20,000.00, and deeds to the purchasers to be made by Pendleton. And it further agreed, that the rents and profits of the farm should be appropriated to the payment of these eighteen purchase money bonds as they fell due, and Patton was to keep possession of the farm and so apply the rents and profits; and if Pendleton failed to pay these eighteen bonds, as they

respectively fell due then this deed was to remain in full force, otherwise to be null and void. The bill prays, that Patton and wife may be decreed to pay the $4,500.00; that Patton may be decreed to pay one-half of the crop of 1871, and the value of the piano, and said $67.89¼, amount found due by the arbitrators on their accounts since date of said contract; that the deed to A. G. Pendleton may be set aside; that said land might be subjected to pay the amounts due the plaintiff generally; and for general relief.

This bill was answered by Robert Patton and wife. They deny the Capehart farm was purchased for Patton and Smith, or that Smith had anything to do with the purchase, or was in any way interested in it, or was connected in any manner whatever with the negotiations which resulted in this purchase. He asserts that $1,000.00 paid on this land, and the $300.00 or $400.00 for improvements, &c., were paid out of Smith's money. They admit that the plaintiffs and they both occupied this property together. But this occupation was under an arrangement made by Patton with Smith at his solicitation, whereby in consideration of Smith's assisting in managing and working the farm, and in consideration of his furnishing a mower, reaper, stock and other materials and things necessary to operate the farm, he (Patton), allowed him (Smith), to occupy the farm with him, and to have an interest in the profits. And they allege Smith did not fulfill his part of this arrangement, and for this reason he was entitled to no interest in the crop of 1869. And while Patton admits that a part of this crop was sold under an execution against him, yet it was for a debt which he says Smith ought to have paid. The answers admit the making of the contract of April 2, 1870, but they assert that it was not intended by said contract to make the $4,500.00 a lien on the Capehart farm, or any part of it; and they insist that the contract is void as to them; for while it was intended, and was supposed to be a full, fair and complete settlement of all

matters between the parties, yet when this settlement was made, he (Patton), had no knowledge that Smith had converted to his own use certain moneys which Patton had furnished him, and which if accounted for, would make his indebtedness to Patton exceed the $4,500.00 which Patton owed under this settlement. This indebtedness of Smith, which did not enter into this settlement, not being then known to Patton, arose thus: R. Patton was attorney in fact for O. A. Patton, trustee of R. Ellen Patton; and was running a saw-mill, shipping railroad-ties, lumber, staves, &c., and he employed said Smith to sell them, and after the payment of expenses of shipment and sale, Smith was to pay over the net proceeds to O. A. Patton, trustee, and he also in like manner sent him certain certificates of deposits to be used by him in same manner. But Smith instead of so applying the proceeds of said lumber and certificates of deposits, applied them to his own use to considerable extent, there being due from him on this account $5,514.76. And that the 1,000.00, $300.00, or $400.00 claimed to have been paid by him on this Capehart farm, was really paid out of these trust funds, in his hands as he, Smith had no other means of making these payments. And as respondent, R. Patton has had to account to said trust estate for all these funds, he claimed them as due him from Smith. Patton also alleges, that in 1868, he sent Smith a draft for $900.00 in favor of his, Patton's wife, with directions to pay out of it a debt of about $200.00, and to lend out the balance for the use of R. Patton's wife to whom the money belonged, but while he paid out this $200.00, he improperly appropriated all the balance. The respondents prayed, that the answer might be considered a cross bill as well as answer. The answer also alleges that all the liens given by him on the forty and one-half acre tract were given with the knowledge, or consent of Smith, and it states that the crop of 1871 was raised solely by Patton, Smith having left the place.

The answers deny all fraud in the sale to A. G. Pendleton, admit the sale of the piano worth about $70.00, on an execution against Patton, but for a debt which Smith ought to have paid. They admit the submission to the arbitrators, but insist that the submission covered much more than the little dealings between the families of the parties. That this submission was intended to cover all the matters in controversy in this suit, and the only reason this was not raised in the arbitration was that Patton was sick. Nicholas Smith files a special replication to these answers, admits the agency spoken of in the answers, states that he had received in such agency $4,838.64, and more than paid it all out as directed, filing an account therefor, with his answer; admits the receipt of the check for $900.00, and shows how he paid it all out, under the direction of Patton and his wife; that all these matters were fully known when the settlement of April 23, 1870, was made and were actually canvassed, adjusted and settled in and by that settlement; and Smith relied on this settlement as a bar to the re-opening of those old accounts. Smith also alleges that Oliver A. Patton owed him $1,100.35, which by said contract of April 23d, Robert Patton bound himself to pay, and for which he asks a decree against him. Smith also claims that by this contract, Robert Patton was to pay off and discharge certain debts of Robert and Oliver A. Patton, on which Smith was endorser. These debts, which are still outstanding and unpaid, amount to $1,335.00, and he asks that Robert Patton be required to discharge them, or to indemnify him against them. An order of publication was made against the defendant, A. G. Pendleton; and on November 11, 1874, the plaintiffs filed as evidence in the cause, a release of the defendant, A. G. Pendleton to Robert Patton, whereby the deed to him and the eighteen bonds named in it, were cancelled. A special rejoinder was put in by Patton and wife, to Smith's special replication, denying the correctness of the accounts filed with Smith's replication.

The court on May 17, 1875, rendered its decree, in which it expressed the opinion that as Robert Patton had by the creation of other liens on the forty and one-half acres of land, destroyed its value as a security, therefore Mrs. Eliza P. Smith was entitled to have the whole of said $4,500.00 debt charged on the Capehart farm of one hundred and eighty-five acres, excepting so much as had been sold in the suit of Capehart *v.* Patton. And it also expressed the further opinion, that N. Smith was by the arbitration, entitled to recover of R. Patton, $84.59, and it decreed said debt, amounting to $5,445.00, should be paid by R. Patton to Mrs. Eliza P. Smith, and said $84.59 to Nicholas Smith, with interest on said liens from the date of the decree, and the costs of suit, and unless the same was paid in thirty days from the rising of the court, it ordered a sale of so much of the unsold residue of the Capehart tract of land, as would be necessary to pay said debts and costs.

R. Patton, on the rendition of said decree, at once presented a petition for a rehearing, on the ground that he had been told by his counsel that in their view of the law, no trial could be had until after a reference had been made to a commissioner, to settle the accounts of the parties, and that under this advice, he had failed to take proof to sustain the allegations of his answer. And he alleges the additional fact, that N. Smith is insolvent, as a further ground for the rehearing. The court however decided that there was no error in this decree, and refused to re-open it, and from this decree R. Patton has appealed to this Court.

*John S. Swann,* for appellants.

*W. A. Quarrier* and *P. Mollohan,* for appellees.

GREEN, PRESIDENT, delivered the opinion of the Court:

The principal question presented by the record is, did the plaintiff, Nicholas Smith, have a lien on any of the

real estate of Robert Patton, and if so, on what real estate, what was the nature and character of this lien, and what debts did it include. The plaintiffs in their bill, claim this lien on two distinct grounds. One because the transactions alleged, gave rise to a resulting trust upon the Capehart farm in favor of N. Smith; and the other, that under the contract of April 23, 1870, an implied lien arose in favor of Mrs. E. P. Smith. The bill alleges that the Capehart tract of land was purchased by N. Smith and R. Patton jointly, and for their joint use, but for convenience of making titles to portions of this land, and for other reasons not stated, it was agreed between the parties that the written contract for the purchase of this land should be made in the name of R. Patton alone, which was accordingly done. That subsequently the plaintiff, N. Smith, sold his moiety of this tract of land to the defendant, R. Patton, for an amount embraced in the $4,500.00, which was never paid. If these facts had been proven, there can be no question that a resulting trust would have arisen in favor of N. Smith, to one-half of this land, and on the sale being made to N. Patton, that an implied equitable lien would have arisen for the purchase money. These facts too, might have been proven by parol evidence, for such resulting trusts remain as they were before the statute of frauds, but the evidence to establish such resulting trust must be clear; *Bank of United States* v. *Carrington et al.*, 7 Leigh 566. In this case these facts are alleged in the bill, but positively denied by R. Patton's answer, and are unsustained by any evidence, unless they are to be inferred from admitted facts and from the contract of April 23, 1870. These admitted facts from which we are asked to draw such conclusions, are that Smith and Patton with their families, resided together in the mansion house on the land, bearing equally the expenses of the household, cultivating the farm together and sharing equally the crops, and Smith afterwards paid to Capehart $1,000.00 of the purchase money of this land. And under the con-

1878.
Special Term.

Smith et ux.
v.
Patton et ux.

tract of April 23, 1870, this joint occupation of the land was continued. But Patton in his answer, explains this joint occupation of the land, by alleging there was a contract made by him and Smith after Patton had purchased this land for his own use only, whereby Smith was permitted for a valuable consideration, to live upon it and cultivate it jointly with him. And its occupation in this manner after April 23, 1870, is accounted for by the terms of the contract of that date, it being agreed upon as a mode of either paying the debt found due to Smith on settlement, or of compelling its payment. Nor does this contract show, that this debt of $4,500.00 was made up in any part of a sale of a moiety of this land by Smith to Patton, nor is there anything on the face of this contract, to indicate that Smith had ever owned any part of this land. The consideration recited is, for money expended by Smith for Patton and love and affection. It is true that the body of the contract does show that Smith sold to Patton some property which entered into the consideration, but it does not appear that a moiety of this farm was a part of the property so sold. On the contrary, the failure to so state in connection with the fact, that "a mower, cider-mill, cow and hogs" are mentioned, would rather justify the conclusion, that the property so sold consisted of personal property on the farm. I think the clear evidence required to establish such resulting trust is wanting in this case, and none such can be regarded as having existed.

The next question is, whether under the contract of April 23, 1870, an implied equitable lien arose. A court of equity frequently implies a trust from the contracts of parties, though no words of trust be used. Thus an order to pay a debt out of a particular fund, gives to the creditor a lien on this fund, but this is distinguished from a covenant by a debtor to pay a debt out of a certain fund, such a covenant not creating a lien on the fund, but creating merely a personal obligation. *Anderson, &c.* v. *De Sore,* and *Same* v. *Galligoe's adm'r,* 6 Gratt. 363; *Rogers* v.

Syllabus 1

1878.
Special Term.

Smith et ux.
v.
Patton et ux.
Syllabus 3

*Hosack's ex'ors*, 28 Wend. 319. See also *Feamster* v. *Withrow*, 9 W. Va. 310, 313. It is however well settled, that a covenant or written contract to set apart and pay the rents and profits of particular specified lands or the proceeds of their sale to the payment of a debt, is in equity a lien on the land against the owner, and all persons claiming under him with notice. See *Legard* v. *Hedges*, 1 Ves. Jr. 477; 3 Bro. Ch. 441; 4 Bro. Ch. 310; *Freemont* v. *Dedire*, 1 P. Wms. 429; *Pinch* v. *Anthony*, &c., 8 Allen 536. A controversy has existed whether a covenant to charge land generally, to be thereafter acquired, with the payment of a debt, would, when such lands were acquired, be held to be an equitable lien on them; but however this may be, it seems to be admitted that if there be such a covenant, and land has been afterwards acquired with an intention to perform or satisfy such covenant, a court would hold such a covenant to create an equitable lien on such land. See *Morrington* v. *Keane*, 2 De Gex & Jones, 318, 59 Eng. Ch.; *Deacon* v. *Smith*, 3 Ath. 323; *Wellesley* v. *Wellesley*, 4 Myl. & Cr. 579; *Gardner* v. *Marquis*, 7 Townsend Cooper's Ch. 301. If the covenant or contract be to charge with the payment of a debt a particular specified tract of land, which the covenantor was thereafter to purchase, it would seem to be a fair deduction from these authorities, that when purchased a court of equity would regard it as held subject to an equitable lien, created by such covenant. See *Metcalf* v. *Archbishop of York*, 1 Mylne & Craig, 547, 13 Eng. Ch. 514. In the case of *Watson* v. *Sadlier*, 1 Malloy's R. 585, 12 Eng. Ch. 383, Sadlier granted Watson an annuity for life, the deed not containing the usual power of distress to enforce the annuity, and naming no lands, either specifically or by the general name of "lands." But it did contain a covenant that Watson might recover and receive from Sadlier and his heirs, executors, &c., and from his and their estate, real and personal, such annuity. When this deed was about to be prepared, Sadlier wrote to Watson and

1878.
Special Term.

Smith *et ux.*
v.
Patton *et ux.*

named certain land which was to be charged with this annuity. The master of the rolls considered that from this letter an agreement should be implied, that the lands named in it were to be charged with the annuity, and that Watson had a lien therefor on them. The Lord Chancellor, Sir A. Hart, approved this view of the master of the rolls, and in so doing, said: "I agree in the view of the master of the rolls, that the letter reduced the general covenant to a specific lien; and I am further of opinion, that if by means of undisclosed incumbrance the annuitant was ousted of those specified lands, the court would lay its hands on any other lands, the property of the grantor," but he rendered no decision in the case, taking time to consider it. This language of the chancellor must therefore be regarded as an *obiter dictum*. The basis of it, I suppose, was that he regarded the deed itself by the covenant in it, that the annuity might be made out of Sadlier's real estate, as creating a lien on all the lands then owned by him. For if the deed had only charged a portion or tract of land, and it had turned out no security by reason of undiscovered encumbrances, I can hardly suppose the chancellor "would have laid his hands on any other lands of the grantor." For I cannot see how a breach of good faith on the part of the grantor, in the deed, could justify the court in regarding the annuity as a lien on lands which could not possibly be held to have been intended by the agreement of the parties to have been charged. In applying these principles of a court of equity to the case before us, we meet with not much difficulty. In the first place, the first part of the contract of April 23, 1870, though badly worded, shows clearly that R. Patton thereby agreed to procure from Bowyer a deed for the forty and one-half acres of land, and then to execute a mortgage on it to secure on it $3,000.00, part of the $4,500.00, for the use of Mrs. Eliza P. Smith. This deed from Bowyer, was afterwards obtained by Patton, and as soon as he obtained it, an equitable lien arose by

virtue of this contract, upon this Bowyer land for the payment of this $3,000.00. This being only an equitable lien, was however substantially destroyed by the giving on said land by R. Patton of legal liens to parties having no notice of this equitable lien, and the bill admitting this, does not seek to charge this Bowyer land with this $3,000.00. The latter part of the contract of April 23, 1870, is drawn still more obscurely. It does not mention by name the Capehart tract of land. But it seems to be obvious enough that the property which R. Patton agreed to sell as fast as he could, and pay over one-half of the receipts of sale on the debt of $4,500.00, meant this Capehart farm, for the contract says that this half of the receipts are not to be paid over till " Patton satisfies a debt he owes to S. P. Capehart, under a decree for $7,000.00," and Capehart then had such a decree to satisfy this $7,000.00 debt by sale of this farm. This part of the contract then being a contract to pay one-half of the proceeds of this Capehart farm, that remained after satisfying Capehart's decree on this $4,500.00, as soon as it could be sold, and in the meantime to let half of the proceeds of the rents and profits of said land be paid to the holder of this $4,500.00 debt, amounts to the creation of an equitable lien on one-half of the Capehart farm, after satisfying the Capehart decree, to secure the payment of this debt of $4,500.00. The fact that the equitable lien on the Bowyer land had been defeated or rendered unavailable by Patton's act, would not justify the charging of this debt of $4,500.00 as a lien on the whole of the Capehart farm. The contract on its face showing clearly that it was not the intention of R. Patton to create a lien on more than one-half of Patton's interest in the Capehart farm; leaving the other half subject to his own disposal. It is also obvious from the words of the contract, that the whole extent of the equitable lien created by this contract, was a lien to secure this debt of $4,500.00 then due; and that it was not intended by the parties to

create any lien on said land for the security of any other indebtedness which might be thereafter incurred in the support and maintenance of Patton's family, by any advances Smith might make in the expenditures for the families of Patton and Smith, who were to continue to live together. Nor was it the intention of the parties to create a lien to secure any future indebtedness of R. Patton to Smith of any sort, such as that which afterwards arose by the sale of Smith's property to pay Patton's debts, or which might arise from the appropriation by Patton of the proceeds of crops raised on the Capehart farm by Patton alone, which ought to have been paid over to Smith, if the contract can be construed to give N. Smith any claim on these crops, which he did not help to cultivate, except as a credit on this $4,500.00 debt. On this point, it is unnecessary to express any opinion now. It is claimed however that as the bill sought to set aside the sale, or more properly, mortgage of this Capehart farm to Pendleton, the plaintiffs were therefore entitled by this suit in equity to have this conveyance to Pendleton declared fraudulent, and this farm sold to pay all their demands, but the answer of Patton positively denies that this conveyance was executed to delay, hinder or defraud his creditors. And no proof was introduced in the case, except simply the fact that Pendleton after the institution of this suit, released all claim to or on this land. That the conveyance was fraudulent, cannot be inferred from this release, as Pendleton may well have thought that his interest in this deed, even though perfectly fair, would not justify him in engaging in litigation. Though the provisions of this deed to Pendleton are certainly unusual, and such as perhaps would justly give rise to the suspicion that the deed was intended to delay, hinder and defraud the creditors of R. Patton, yet they are not such as would justify this court in declaring the deed void as fraudulent on its face, when such fraud was positively denied in the answer, and no evidence was produced to

1878.
Special Term.

Smith et ux.
v.
Patton et ux.

Smith *et ux.*
v.
Patton *et ux.*
Syllabus 4

sustain it. But even in the absence of any allegations of fraud in this conveyance, the seeking to enforce other demands than this $4,500.00, though these demands were mere legal claims, would not render the bill multifarious. See *Smith* v. *McLain,* 11 W. Va. p. 654. The bill alleged and the contract of April 23, 1870, on its face shows that the demand against R. Patton for this $4,500.00, arose upon a final settlement of all claims and demands of every description of the parties to this contract and although the answers claim, that this settlement was made in ignorance on the part of both Patton and his wife, that N. Smith was largely indebted on account of certain matters specified in the answers, and which occurred prior to such final settlement, yet this ignorance is denied in the replication, which alleges that they were taken into consideration, included in and adjusted by the settlement which was the basis of this contract of April 23, 1870. No proof was taken to prove these facts assailing the fairness of this settlement, and of course it would have been improper for the court to open this settlement and direct an account of transactions prior to its date, to be taken by a commissioner, and it would have been equally improper for the court to have made any enquiry as asked for by the plaintiff, Smith, in his replication as to the debts on which Smith was security, which Patton, by this contract of April 23, 1870 contracted to pay, but which it is alleged he failed to pay. For Smith's only redress for such failure was an action at common law. It remains to consider whether a rehearing ought to have been granted to R. Patton on his petition. It is based on the allegation, that he was advised by his counsel that it was unnecessary before the hearing of the cause to take any evidence to support his answer, and that the court without any evidence of the truth of the allegations in the answer, which were denied, would open the accounts between the parties and refer their claims to a commissioner for settlement. And this petition

further alleges the insolvency of Smith as an additional reason why the cause should be reheard. It certainly requires the citation of no authority to show that if a cause is submitted to the court for decision by counsel, with full knowledge of all the facts, and the court decides the cause against him, the simple fact that it has so decided, is no ground for granting him a rehearing in order that he may make a different case by proof; and the insolvency of Smith is equally unavailing as a ground for a rehearing, as on the case as made out by the pleadings, and no evidence has been produced, they have no claim against the plaintiffs, all the claims set up by them, having been included in the general settlement made on April 23, 1870.

The only remaining question is, did the court err in ordering a sale of the Capehart farm. The bill states that about half of this farm had been sold under a decree of the court for $9,811.00, of which upwards of $7,000.00 went to pay the unpaid purchase money due Capehart, and the balance was to be applied to certain judgments against Patton. What were the amounts of these judgments, and to whom due, does not appear. It was obviously improper as this Court has frequently decided to sell land to satisfy such a lien till all prior liens and their priorities had been ascertained. This may have been done in the suit of *Capehart* v. *R. Patton*, indefinitely referred to in the bill, but if so, it does not appear in this cause, and unless and until it does, no sale of this land, or of any part of it in this cause could properly be decreed. The record in its present condition does not show satisfactorily whether this debt of $4,500.00 belongs really to N. Smith or to his wife Mrs. Eliza P. Smith, and no issue having been made in reference to this point, I deem it improper at this time to express any opinion on this question. The cause must be remanded to the circuit court of Kanawha county, to be further proceeded with, and the decree for this $4,500.00 debt should be made in favor of one or the other as may

appear proper when the decree is rendered. By the terms of the contract of April 23, 1870, Patton agreed to pay one-half of his receipts of sales of portions of the Capehart farm as fast as they were received after the payment of the Capehart debt for purchase money. That is as I understand the contract, that out of the sales of the Capehart farm this purchase money debt was to be paid, and then one-half of the sales of the residue of the farm, left after paying out of the sales this purchase money debt, was to be applied to the payment of this $4,500.00 debt.

The decree therefore of the circuit court of Kanawha county, rendered on May 17, 1875, must be reversed and annulled, and the appellants must recover of the appellee, Nicholas Smith, their costs about their appeal in this Court expended, and this Court proceeding to render such decree as the court below ought to have done, is of opinion, that the debt of $4,500.00 named in the contract of April 23, 1870, filed with the bill, was the balance found due on a settlement of all accounts up to that date, between the plaintiffs and the defendants, R. Patton and wife, and that no accounts or demands of R. Patton or his wife against the plaintiffs, or either of them, prior to that date, can be offset against the said debt and that the same is an equitable lien on one moiety of so much of the land purchased of S. P. Capehart in the bill named, or of the proceeds of sale thereof as may remain after satisfying the amount decreed to be paid to S. P. Capehart in the chancery cause of S. P. Capehart v. Patton and others named in the bill, and that none of the other demands of the plaintiffs or either of them named in the bill, is a lien on any of the lands of the defendants, or any of them, and the court doth therefore adjudge, order and decree, that the said debt of $4,500.00 is a lien on that portion above described, of the said land bought of Capehart; and that the bill, so far as it seeks to enforce any claim other than this, be dismissed without prejudice to

any other suit which the plaintiffs may be advised to institute to enforce them. But the court being further of opinion that the proper parties are not before the court so as to justify a sale of any portion of the said lands to satisfy this equitable lien, doth further adjudge, order and decree, that this cause be remanded to the circuit court of Kanawha county, with directions to give leave to the plaintiffs to amend their bill, and bring before the court all the necessary parties, in order to the enforcement of said equitable lien, by a sale of said portion of said land, after all proper preliminary proceedings have been had; and that such other and further proceedings shall be had as are in accordance with the principles laid down in this opinion, and the rules governing courts of equity.

1878.
Special Term.

Smith *et ux.*
v.
Patton *et ux.*

The other Judges concurred.

CAUSE REMANDED.