## CHARLESTON.

WILLIAM E. FOSTER *v.* FRAMPTON-FOSTER LUMBER CO.

Submitted October 23, 1923.   Decided April 29, 1924.

LIENS—*Creditor Buyer Held Entitled to Equitable Lien on Goods Purchased From Insolvent Corporation for Whom Receivers Were Appointed.*

F. Company, a corporation, while insolvent, and indebted to K. Company, a corporation, in a large amount for lumber, in

order to induce further shipments of lumber by K. Company to it, sells to K. Company all of the four-quarter, number two, common oak and better, at stated prices according to grades, which it owns at three different locations, immediately to be inspected and graded by a representative of K. Company; but before such inspection or grading, and after K. Company has made shipments of lumber to F. Company on the faith of the purchase of said oak lumber, receivers are appointed in suits to wind up the affairs of F. Company as an insolvent corporation. K. Company in the distribution of the assets of the insolvent corporation has an equitable lien on the oak lumber in question for the value of its shipments of lumber to the insolvent company subsequent to the contract of purchase.

McGINNIS, JUDGE, absent.

Appeal from Circuit Court, Greenbrier County.

Action by William E. Foster against the Frampton-Foster Lumber Company, in which the Keystone Manufacturing Company intervened. From judgment rendered, the Keystone Manufacturing Company appeals.

*Reversed and remanded.*

*Price & McWhorter* and *Spears & Irons,* for appellant.
*Charles S. Dice,* for appellee.

LITZ, JUDGE:

The defendant, Frampton-Foster Lumber Company, hereinafter called Foster Company, is a Delaware corporation, and prior to December 5, 1921, was engaged in the lumber business with its chief office in the city of Pittsburgh, Pennsylvania. It consumed, in its wholesale trade and the operation of a factory for the manufacture of finished wood products, large quantities of lumber which it produced and purchased from others.

On December 5, 1921, in the court of common pleas of Allegheny county, Pennsylvania, a receiver was appointed for the business and properties of the said defendant, in that State; and thereafter, on the 7th day of December, 1921, an ancillary receiver was appointed in this cause to take charge of its assets and affairs in West Virginia. The plaintiff sues

as a stockholder and creditor of said corporation, and prays
that its business be wound up and its property and assets
in West Virginia converted into money and distributed ac-
cording to law.

The Keystone Manufacturing Company, hereinafter called
Keystone Company, is also a corporation engaged in the lum-
ber business.  On October 21, 1921, the Foster Company, al-
though indebted to the Keystone Company in the sum of $14,-
000.00 for lumber, in order to meet the demands of its factory
enterprise and general trade, requested further shipments of
lumber to it by the Keystone Company.  The latter, however,
was unwilling to extend further credit to the Foster Com-
pany.  So in consideration of further shipments of lumber
to the Foster Company by the Keystone Company, the former
sold to the latter, at stated prices according to grade, all of
the four-quarter, No. 2, common and better oak lumber, ex-
cepting one carload lot, then owned by the Foster Company,
located at three mill sets in Greenbrier county.  This oak
lumber was to be inspected and graded by a representative
of the Keystone Company and thereafter delivered by the
Foster Company, over a short line railroad, f. o. b. cars
White Sulphur.

A few days after the transaction the Keystone Company
sent its inspector to take up the lumber, but he did not do so
on account of suspension in the operation of the short line
railroad resulting from recent floods, which condition con-
tinued until after the appointment of the receivers.  For this
reason none of the lumber had then been inspected or graded.
In the meantime the Keystone Company, upon the faith of
its purchase had delivered to the Foster Company further
shipments of lumber to the value of $4,773.14, without having
received any payments on its $14,000.00 account.

The Keystone Company filed a petition herein asserting
title to the oak lumber under its contract of purchase.  The
other creditors of the Foster Company, resisting the claim
of ownership by the Keystone Company, contend that the sale
was executory only, and further that its consummation would
result in a preference to the Keystone Company, violative of
Section 2, Chapter 74, Code, declaring that every transfer

or charge made by an insolvent debtor, attempting to prefer one creditor to the exclusion or prejudice of another shall be void as to such preference.

The circuit court by its decree of January 4, 1923, sustained both contentions and held that the lumber in question constituted a part of the assets of the defendant company for the payment of its debts. Although the bill charges that the assets of the defendant company, if properly administered, would exceed its debts, it appears to have been at the time of, and for several months prior to, the appointment of the receivers, hopelessly insolvent.

In determining whether the sale of a chattel is executed or executory only, our cases hold that the intention of the parties, to be ascertained from the terms of the contract, character of the subject matter, and surrounding conditions, shall govern. *Revelle* v. *McQuay*, 85 W. Va. 129; *Poling* v. *Hoffman*, 84 W. Va. 199; *Thomas* v. *Lewis, Hubbard & Co.*, 79 W. Va. 138; *Lynch* v. *Merrill*, 72 W. Va. 514, 516; *Hood* v. *Block Bros.*, 29 W. Va. 244; *Morgan* v. *King*, 28 W. Va. 1; *Moore* v. *Patchin*, 71 W. Va. 192; *Buskirk* v. *Peck*, 57 W. Va. 360.

In the case of *Hood* v. *Block Brothers*, plaintiff by written contract on October 27, 1884, sold to defendants all the cheese in his cellars, being between eighty and ninety loaves, to be paid for on delivery at the price of $.12¼ per pound for the better grade, and $.10¼ per pound for the cracked or second grade. The contract further provided for shipment or delivery before January 1, 1885. Discussing the nature of the sale, this Court said:

> "The written contract of October 27, 1884, shows upon its face that there was not to be an immediate delivery of the cheese, *that there was to be no payment until the quality of the cheese as well as the precise quantity had been ascertained by classifying and weighing it, and neither of these things were to be done until the time fixed upon for delivery.* In the absence of anything indicating that an immediate delivery was intended by the parties, this was clearly not a completed but an executory sale."

The case of *Moore* v. *Patchin* involved a contract for the sale of lumber to be manufactured by the seller from timber

then standing and to be delivered f. o. b. cars at the price
of $17.00 per thousand.  $600.00 was paid and applied on
the stumpage of the timber.   The contract provided for
measurement to be made in the log by the purchaser's agent,
for payment of a certain sum per thousand as the lumber
was sawed and stacked on the mill yard, and for an addi-
tional amount per thousand when hauled and loaded on cars.
It authorized the purchaser to direct the manner of sawing
and the time of hauling to the railroad; and retained $1.00
per thousand until the job was completed to insure the faith-
ful performance of the contract by the seller.   Title was held
to have passed on payment of the amount to be paid when
the lumber was sawed and stacked.   In reaching this con-
clusion it is stated in the opinion:

> "The terms and manner of payment, which applied
> the $600.00 cash to the stumpage at $4.00 per thousand
> for the first 150,000 feet, and the payment of so much
> more per thousand feet at certain stages of the work,
> taken in connection with the further facts that no other
> measurement was to be made after the sawing was done,
> and that appellant was given the right to direct the
> manner of sawing and the time of delivery on board
> the cars, signified a clear intention to pass title to the
> lumber on the mill yard.   Delivery at the place agreed
> is not indispensable to the passing of title.   It may pass
> even before delivery, and whether it does so pass or not
> is largely a matter of intention between the buyer and
> seller, to be gathered from the entire agreement and its
> subject matter."

In *Lynch* v. *Merrill* the contest arose between the purchaser
of logs at an agreed price per cubic foot to be rafted or
delivered as rafted at a specified place, and one claiming at a
sale under an execution levied on the logs as the property of
the seller.   Considering the question of the purchaser's own-
ership at the time of levy of the execution in favor of the
seller's creditor, the opinion in the case states:

> "The trial, however, proceeded upon the wrong theory
> as appears from the instructions in the bills of excep-
> tions 8 and 10, and thereby the jury may have been,
> and probably were, misled.   The first instruction told
> the jury in substance that if anything remained to be

96 W. Va.

done, such as measuring, counting and branding the logs, title thereto could not vest in the defendant (purchaser) until they were measured, counted and branded, omitting entirely *the intention of the parties* as to the time at which title should vest in the purchaser.''

In *Poling* v. *Huffman* the contract of sale provided for the purchase of all the lumber to be manufactured by the seller from a tract of land and stacked on the mill yard to dry, to be paid for at stated prices per thousand feet according to kinds and grades. Under the terms of payment $500.00 was to be paid in cash and such other sums monthly thereafter as would meet the operating expenses of the seller providing that there should then be enough lumber stacked on the mill yard or at the railroad to cover such sums. It was held that the terms of payment having been complied with by the purchaser, title to the manufactured lumber vested in the purchaser, when stacked on the mill yard, even before inspection, grading or measurement.

Under these cases, and especially the last, it may be that the sale to the Keystone Company had become executed prior to the receiverships; at any rate, this company should have an equitable lien on the lumber in question for the value of lumber shipments by it to the Foster Company after the sale, which was made for the express purpose of securing to the Keystone Company payment for such shipments.

An equitable lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation, or is declared by a court of equity out of general consideration of right and justice as applied to the relations of the parties and the circumstances of their dealings. A lien necessarily excludes any idea of ownership by the party claiming it. A lien, whether implied or by contract, confers no right of property upon the holder. It is neither *jus ad rem* nor *jus in re*. *Fallon* v. *Worthington*, 22 Pac. 960, 6 L. R. A. 708.

In the case of *Hurley* v. *Atchison, Topeka & Santa Fe Ry.*, 213 U. S. 126, where a railroad company which was purchasing coal from a coal company, under agreement to pay on the 15th of each month for all coal delivered to it during the

preceding month, for the purpose of enabling the coal company to meet its financial demands, made advances to it on coal before delivery, it was held that the advance payments for coal yet to be mined was a pledge on the coal, and that the trustee in bankruptcy for the coal company took the mine subject to the obligation to deliver coal to the extent of the advancements; the court in its opinion saying:

"The railway company was simply paying in advance instead of waiting until the fifteenth day of the succeeding month, and the money by it loaned was not loaned as an independent transaction—such as would be made by an ordinary money lender—but an advancement made in anticipation of the delivery of the coal. To ignore this element and make the bankruptcy proceedings operate to discharge this obligation of the coal company, and leave the transaction as one of an independent loan of money to the coal company would result in destroying the full equitable obligations of the coal company, and place the parties in their relations to each other on an entirely different basis from what had been contemplated by them when they entered into this original arrangement."

*Gage Lumber Co.* v. *McEldowney,* 207 Fed. 255, also holds that the complainant having purchased a large quantity of lumber to be manufactured and shipped to it by the seller, and having advanced large sums on the purchase price thereof before the lumber was sawed, acquired an equitable lien on the lumber piled in the yards of the seller and intended to be applied on the contract for the balance of the advances, which is enforceable as against the seller's trustee in bankruptcy. The court said:

"The nature of an equitable charge or lien, and the principles upon which the courts proceed in fastening such charges upon the objects intended as security, are so familiar that we are content to cite only a few of the leading decisions. In *Hurley* v. *Atchison, Topeka & Santa Fe Ry., supra,* a mining company had contracted to mine and deliver coal sufficient to meet the current needs of the railroad company, but through financial embarrassment was unable to do so; and in order to assist the mining company to keep its agreement, the railroad company furnished the mining company with money in

96 W. Va.

advance of the agreed time of payment, and it was held that this implied 'a purpose that the coal as mined should be delivered, and is from an equitable standpoint to be considered as a pledge of the unmined coal to the extent of the advancement'.

"This was not because of the intervention of bankruptcy or of the trustee's continued performance of the parol agreement previously made between the mining company and the railroad company, as counsel for the Clairfield Company urge. It was in consequence and in recognition of the previous parol agreement. Justice Brewer there distinctly approved language of the Court of Appeals, which is pertinent here:

" 'The money paid in advance entitled the railway company to an amount of coal which the money so advanced would pay for according to the terms of the original contract. We think the inevitable meaning of the new arrangement, interpreted in the light of the conditions surrounding the parties and as necessarily intended by them, was to pledge (set apart) a sufficient amount of coal after it should be mined as security for the payment of advances made. This result is not expressed in the conventional form of a mortgage or pledge, but the method of producing it was devised for the purpose of acquiring the needed money by the coal company and of furnishing security for its repayment. If the parties intended the arrangement to be one for borrowing and securing the repayment of money, we ought, as between them, to so regard it, and to treat it as creating an equitable charge or lien, however inartificially it may have been expressed.' "

In the case of *Kline* v. *Cofield et al.*, (Ky.) 169 S. W. 477, it was held that where the plaintiff purchased certain logs from the defendant to be hauled by the latter to the railroad station, and there delivered to the former, the purchaser had an equitable lien on the logs for advances made on the purchase price after they had been measured and branded in the woods. See also *Hamilton* v. *Bank*, 3 Dill. 230, 235; Williston on Sales, page 170.

The consideration for the lumber in controversy was not merely a past indebtedness from the Foster Company to the Keystone Company, but to the extent of the advances by subsequent shipments from the latter to the former it constituted a benefit to the insolvent's estate.

We therefore hold that the Keystone Company has an equitable lien on the lumber in contest to the value of the shipments of lumber made by it to the Foster Company subsequent to the contract of October 21, 1921.

*Reversed and remanded.*