# CHARLESTON.

C. W. CAMPBELL *v.* HUTCHINSON LUMBER COMPANY

(No. 6285)

Submitted September 25, 1928.   Decided October 9, 1928.

*Rolla D. Campbell, Blue, Dayton & Campbell,* appellants.
*George S. Wallace,* appellee.

LIVELY, PRESIDENT:

This controversy is between C. W. Campbell, Robson, Alex Laing, Johnson, Mathews, John Laing, and Hutchinson, on the one side as plaintiffs, and defendant Union Bank & Trust

Company, a corporation, on the other side, each contestant claiming superior lien on, and consequent right to, certain moneys derived from sale of standing timber on Pigeon Creek in Mingo county formerly owned by Hutchinson Lumber Company, a corporation. The Kanawha Valley Bank at Charleston in Kanawha county held a portion of the proceeds of the timber in the amount of $10,461.09 deposited to the credit of the Hutchinson Lumber Company (hereinafter called the Lumber Company); and defendant George S. Wallace, special commissioner, had the other portion of $8,300.00, and which had been turned over by him to defendant Union Bank & Trust Company by virtue of garnishment proceedings before this bill was filed. So, the controversy is over the right of the respective claimants to two funds, the Kanawha Valley Bank fund of $10,461.09, and the Wallace fund of $8,-300.00.

Plaintiffs claim superior right to these funds by virtue of an alleged equitable lien thereon; and Union Bank & Trust Company (hereinafter called Union Bank) claims superior right by virtue of a judgment against the Lumber Company, and garnishment thereon against Kanawha Valley Bank and Wallace, special commissioner, both as debtors of the Lumber Company. The Union Bank denies that plaintiffs have any equitable lien upon the two funds; or, if they have such lien, it is subordinate to that of Union Bank. On the other hand, plaintiffs contend that Union Bank has no lien against the Kanawha Valley Bank fund of $10,461.09, because its alleged judgment against that fund was void, because the court had no jurisdiction to pronounce it.

The facts are, substantially: On April 7, 1924, all of the plaintiffs except Mathews and Robson were directors of the Lumber Company (Robson being its treasurer), and all were heavy stockholders therein. The Lumber Company was in financial straights, and owed to the Federal Government taxes amounting to approximately $40,000.00, and a distress warrant therefor had been issued and was about to be levied on the corporate property. To prevent sacrifice of the property under distress sale, the directors met and passed the following resolution on April 7, 1924:

"The question of additional income taxes for the year 1917 and 1918 as assessed by the Federal Government was brought to the attention of the Board. The extra assessment was as follows:

Year 1917 $25,317.77)  these figures do not in-
Year 1918  13,109.04)  clude the penalty and
                       interest.

There being no funds available and a penalty having already been added to the above figures, together with interest, and the government having served a distress warrant to attach the property of the company, it was necessary that some action be taken immediately to pay these taxes, and after some discussion the following resolution was adopted by consent of those contributing to the raising of the money as brought out in the resolution as follows:

Whereas, this company is indebted to the Treasurer of the United States for income taxes in the sum of about $40,000.00, and it being necessary to raise the money to be paid to the Collector, A. B. White, at Parkersburg, West Virginia, on the 10th of this month; and,

Whereas, it is necessary that this company arrange to borrow that amount of money in order to liquidate said taxes,

Thereupon, Mr. T. J. Robson agreed to furnish $5,000.00 thereof on a note of this company to and Mr. Daniel Mathews agreed to furnish $5,000.00 thereof on a note of this company to him; and Mr. W. R. Johnson agreed to furnish $5,000.00 thereof on a note of this Company to him; and Mr. Daniel Mathews agreed to furnish $5,000.00 thereof on a note of this company to him, and Mr. John Laing, Mr. R. L. Hutchinson and Mr. C. W. Campbell agreed to endorse a note for $20,000.00 payable in sixty days to be used at the Kanawha Valley Bank; thus making the $40,000.00; and,

Whereas, it is necessary to indemnify the said persons for the moneys furnished by them and for said endorsers, it is ordered and resolved by this Board that any cash or notes received from the sale of the Pigeon Creek timber in Mingo County shall be pledged and used for that purpose and for no other until said notes are all paid.

It is further ordered that if the Pigeon Creek

timber be not sold, the president of this company be authorized to execute a deed of trust on said timber and indemnify and save harmless;

Be it further ordered that in case said lands and timber owned by this company in Tennessee should be sold, and any cash received from same shall be applied to these notes."

Johnson, Alex Laing, Mathews and Robson each immediately furnished $5,000.00, and took the Lumber Company's notes for that amount; and Campbell, Hutchinson and John Laing endorsed the Lumber Company's note for $20,000.00 which was discounted at Kanawha Valley Bank, and the proceeds thereof, $19,800.00, together with the $20,000.00 furnished by checks from Johnson, Alex Laing, Mathews and Robson, were placed to the credit of the Lumber Company in Kanawha Valley Bank, and checks drawn thereon to pay the federal tax, the first two checks dated April 9, 1924, for $25,-417.77, and $10.00 (penalty), and the other check dated April 14, 1924, for $13,109.04, making in all $38,536.81. On April 16, 1924, the Pigeon Creek timber was sold and a cash payment of $6,500.00 was put to credit of the account; and the first deferred payment of $6,500.00 was likewise credited on November 20, 1924. The purchaser failed to make further payment and in a creditors' suit to sell the timber, the Lumber Company's balance of purchase money was set up in its answer and decreed to it. From the sale in the creditors' suit there was paid to the Lumber Company through George S. Wallace, special commissioner, $5,844.41 as of October 7, 1925, and $8,159.23 as of March 31, 1926, and credited to the account. The last payment of $8,300.00 went into Wallace's hands and was garnished by Union Bank and paid to it under order of the circuit court of Cabell county, on October 15, 1926. This is the "Wallace fund" in controversy. Out of the Pigeon Creek funds deposited in the Kanawha Valley Bank, Robson, treasurer of the Lumber Company, paid to Johnson, Alex Laing, Mathews and Robson each $3,000.00 which sums were credited on their respective $5,000.00 notes, leaving due to each of them $2,000.00 as of August 26, 1928. But nothing was paid by the treasurer on the $20,000.00 note

on which Campbell, John Laing and Hutchinson were endorsers, except the interest on the note as it was renewed.

It will be observed that the Pigeon Creek money which was deposited amounted to $27,003.74 and there was paid out of it $12,000.00 to Johnson, Alex Laing, Mathews and Robson, and interest on the remainder of the debt of $40,000.00 as represented by all the notes. Plaintiffs figure the interest and principal paid on the debt of $40,000.00 to be $16,003.74. But plaintiffs say in the brief that the total amount received from the Pigeon Creek timber from April 9, 1924, to June 5, 1926, (the date of the garnishment) is $29,003.74. Whether there was $2,000.00 derived from the timber deposited after the last deposit of $8,159.23 March 31, 1926, we are not advised as it does not clearly appear in the statement of the transactions with the Kanawha Valley Bank filed, from what source all the various credits are traceable. Many sums were deposited from various sources. The sums from the timber were put in the general account of moneys received by the Lumber Company from all sources. In addition to the principal and interest paid amounting to $16,003.74, the Lumber Company paid state and federal taxes, which were pressing, amounting to $2,213.94, leaving in bank $10,461.09 as of June 5, 1926, according to plaintiffs' evidence, and this sum constitutes what has herein been termed the "Kanawha Valley Bank fund", claimed by each contestant. The equitable lien claimed by plaintiffs on these two funds is based on the resolution of April 7, 1924, above quoted. Union Bank claims its lien on these funds as follows: On May 4, 1926, it recovered judgment in Cabell county circuit court against the Lumber Company and Hutchinson for $13,328.72 and $24.85 costs, then it issued and placed in the hands of the sheriff of that county execution on June 4, 1926, and on the following day suggestion was issued and served on Wallace, special commissioner, as debtor of the Lumber Company, and on June 5, 1924, it issued and served like suggestion on Kanawha Valley Bank in Kanawha county. Such proceedings were taken in the Wallace suggestion that by court order, Wallace paid $8,093.42 over to Union Bank on October 5, 1926; and by virtue of like order dated December 5, 1927, Kanawha Valley

Bank paid over to Union Bank $5,874.06, the balance of its judgment in full. But on May 17, 1927, plaintiffs filed the bill in this case for the purpose of asserting its equitable claim to the Wallace fund (then already paid to Union Bank) which they say was thus taken by Union Bank without their knowledge; and to assert their equitable lien on the Kanawha Valley Bank fund then tied up by the garnishment, and obtained restraining order against further proceedings under that garnishment. In the bill they charge, upon information and belief, that the Lumber Company was insolvent on April 7, 1924. They pray for repayment to them of the "Wallace fund," and that the "Kanawha Valley Bank fund" be decreed to them. Defendant Union Bank answered denying that plaintiffs had equitable lien on either fund; that if there was any such intention to give such lien by the resolution of April 7, 1924, that intention had been abandoned as shown by the subsequent acts of plaintiffs and the Lumber Company; that its court order for payment of Wallace fund was regular and valid; denies that its garnishment of the "Kanawha Valley Bank fund" was void (in answer to a charge to that effect in the bill); avers that it is not advised of the Lumber Company's insolvency; and for affirmative relief says that the Lumber Company's assets consist of stock in a California corporation on which its judgment and execution is a lien; asks for a receiver of the Lumber Company's property; that the officers of the company be required to disclose fully its assets; and asks for full disclosure from Robson, treasurer, of his disposition of the Pigeon Creek money and concerning the notes given and endorsed by plaintiffs set out in the bill, and for general relief. General replication was made to the answer. The parties went to proof, and on December 5, 1927, plaintiffs' injunction was dissolved and the bill dismissed. Later, on May 14, 1928, this appeal was awarded. When the bill was dismissed and no stay asked for, Union Bank prosecuted its garnishment proceeding on the Kanawha Valley Bank fund and obtained order for its payment on the same day plaintiffs' bill was dismissed, and subsequently the Kanawha Valley Bank paid to Union Bank $5,874.06, the balance of its judgment against the Lumber

Company including interest and costs. There is a controversy over the Tennessee property. Union Bank says that if plaintiffs have equitable liens on the Pigeon Creek timber funds and on the proceeds of the Tennessee lands they should be required to first take the proceeds of the latter and leave the former to defendant, under the theory of marshalling the assets. It appears that no cash or its equivalent was ever received from lands in Tennessee by the Lumber Company. By stipulation of August 21, 1928, (after the case was appealed), it is shown that pending the garnishment proceedings against Kanawha Valley Bank, plaintiffs in this suit appeared therein by petition but later withdrew by leave of the court without prejudice. Also, by stipulation of same date it is shown that Kanawha Valley Bank on July 25, 1927, recovered judgment (on the $20,000.00 herein described) against Hutchinson Lumber Company and R. L. Hutchinson for $21,-196.66, and thereafter issued execution to sheriff of Cabell county who thereupon took steps to sell certain stock owned by the Lumber Company, under the statute, by proper suit in chancery, pending which suit, the Union Bank instituted a general creditors' suit against the Lumber Company and enjoined the sheriff and all creditors from prosecuting suits against the Lumber Company, which suit is now pending in which Union Bank, without waiving its claim to the two funds by virtue of its garnishment here litigated, asserts first lien on certain other personal property of the Lumber Company, in the event that its lien on the two funds is lost in this suit.

1. The main error relied upon by appellants is denial of their superior equitable lien upon the two funds, which error, of course, includes any finding that appellants had waived their lien upon the Kanawha Valley Bank fund by their subsequent conduct. The decree simply dissolved the injunction and dismissed the bill. It does not say in terms or by inference that appellants had waived its lien upon the fund.

2. Another alleged error is that the court denied appellants subrogation to the lien of the United States Government distress warrant, they having paid off and discharged the same.

3. The next error is failure to deny Union Bank any right.

to the Kanawha Valley Bank fund by virtue of its garnishment, inasmuch as no execution had been issued on its judgment directed to the sheriff of Kanawha county where the garnishee's principal place of business was located, and therefore the Cabell circuit court was without jurisdiction to entertain garnishment of that fund.

4. Error is also based on failure to decree the Kanawha Valley Bank the right to set off the deposit in its hands against its note of the Lumber Company for $20,000.00 endorsed by Hutchinson, Campbell and John Laing, accommodation endorsers, inasmuch as the Lumber Company was insolvent.

5. Error is also based on failure to require Union Bank to first exhaust its remedy against other property of the Lumber Company on which it had a lien before resorting to the two funds on which appellants had their equitable lien.

Logically the first inquiry is, (1) whether appellants had an equitable lien on the Pigeon Creek timber funds; and (2) if so, whether it is superior to that of appellee bank. For if that inquiry be found against appellants the decree must be affirmed. On this point, appellee says that the resolution in the subject matter of which the directors were financially interested from a personal standpoint, renders the resolution abortive as violative of section 52, chapter 53, Code, which says: "No member of the Board shall vote on a question in which he is interested otherwise than as stockholder, except the election of a president or other officer or employee, or be present at the board while the same is being considered; but if his retirement from the board in such case reduce the number present below a quorum, the question may nevertheless be decided by those who remain." While the dealings of directors with the corporation are viewed with jealousy where the dealings affect the right of others and the presumption is that they are fraudulent, this presumption is not conclusive, and may be rebutted by clear and convincing evidence to the contrary. Such dealings are not void, but voidable only. *Hope* v. *Salt Company*, 25 W. Va. 789; *Twin Lick Oil Company* v. *Marbury*, 91 U. S. 587.

The facts here show that the directors were obtaining no personal benefit other than was common to all the stockholders and other creditors. On the contrary they were making themselves liable for payment of the corporation's debt. The payment of that debt was urgent and immediate. The distress warrant for the federal taxes was about to be executed. To allow the corporate property to be thus sold and sacrificed would have been disastrous to all concerned including the Union Bank. The rule under consideration does not go so far as to preclude the corporation from availing itself of the help of a director in such an emergency. The act of these directors, instead of being suspicious and void, was legitimate and commendable. They received no profit, but voluntarily placed themselves in a position which might entail serious loss to them.

Did the resolution create an equitable lien on the funds derived from the Pigeon Creek timber? Appellee argues that the resolution attempted to pledge the funds, and the pledge failed, because there was no delivery of the notes or funds to appellants. While a pledge to be effective requires delivery, the very essence of an equitable lien is that while the possession of the thing remains with the debtor who holds the proprietary interest, the equitable lien continues. 3. Pom. Eq. Juris., (4th ed.), section 1233. This author in the same section points out the difference of an equitable lien from a common law lien which is simply a right to retain possession of the chattel until the debt is paid; possession being a necessary factor; whereas, lack of possession is essential to an equitable lien. In *Knott* v. *Mfg. Company*, 30 W. Va. 790, it is said: "Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund therein identified, a security for a debt or other obligation, or whereby the party promises to convey, assign, or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property." To the same effect is *Foster* v. *Lumber Company*, 96 W. Va. 325; *Jones* v. *Blankenship*, 79 W. Va. 541; 3 Pom. Eq. Juris. (4th ed.), sections 1234, 1235. This resolution falls within the doctrine and definition of equitable liens. The resolution

shows the pressing necessity for borrowing money, the arrangement therefor with the appellants, the intention to indemnify them, and the appropriation of cash or notes derived from specific property for that indemnity, and to be used for no other purpose. If the property was not sold, then a deed of trust was to be given on it to indemnify and save harmless the appellants. The lien on the proceeds from the property if sold, was designed to be of equal dignity to a deed of trust lien on the property itself, if not sold. The intent to give security being clear, equity will treat the instrument as an executory agreement for such security. This executory writing clearly creates an equitable lien upon a specific fund, and should be so decreed by a court of equity "out of general consideration of right and justice as applied to the relations of the parties and the circumstances of their dealings." *Fallen* v. *Worthington,* 6 L. R. A. 708. Can it be doubted for a moment that the Lumber Company could resist the application of this fund as against a demand from appellants? But this controversy is not between the appellants and the Lumber Company, and this brings us to the question whether appellants' equitable lien is superior to the lien of appellee. As to the "Wallace fund" there can be little question of Union Bank's lien, for the suggestion was issued and served in Cabell county, while the sheriff of that county held an execution. It is said by appellants that the fund in the hands of Wallace, special commissioner, was in *custodia legis* and not subject to garnishment, and therefore no lien in favor of appellee exists. But that point is set at rest by *Boylan* v. *Hines,* 62 W. Va. 486, which holds that funds in the hands of a special commissioner decreed to a person are subject to garnishment by a judgment creditor of that person.

The equitable lien of appellants to the funds is tantamount to an equitable assignment or appropriation of those funds by the Lumber Company. The moneys to be derived from the timber was to be used for no other purpose than to pay appellants' obligations. The Lumber Company's possession was in the nature of a trust. It is quite generally held that the lien of an execution, attachment, or proceeding by garnishment, attaches the real, rather than the apparent interest, of

the principal debtor, and is therefore subject to alienations or encumbrances previously made by him; and Freeman on Executions, in Vol. 1, section 170 (3rd ed.), says this is true whether the encumbrance or alienation "was known to the judgment creditor, or not." And it is said in 12 R. C. L. p. 848, section 90, that, "Rights under garnishment are subordinate to a good, pre-existing equitable assignment, though the latter is not perfect at law." And this Court has said: "The extent of the debtor's right in the property determines the extent of the right of the attaching creditor, by the issuance and levy of a process is effected nothing more than the sequestration of the debtor's interest in such property. If he had no interest, service of the process avails nothing. It is abortive. Our cases uniformly so hold." *Howell* v. *McCarty,* 77 W. Va. 695, 698. But it is argued that both Wallace, special commissioner, and Kanawha Valley Bank held these funds as belonging to the Lumber Company, with no notice of appellants' equitable assignment, and appellee not knowing of this secret lien or assignment, acquired by diligence a superior lien in a lawful mode and is an encumberancer without notice. We do not think the want of notice of the equitable assignment can affect the legal status of the appellee. The general rule is well stated in 28 C. J. p. 110, section 153, as follows: "As a general rule it is not necessary to the validity of the assignment of a chose in action as between the assignor and the assignee, that notice of the assignment should be given to the person from whom the debt is owing; and in most jurisdictions this rule obtains as between the assignee and a garnishing creditor of the assignor, unless, of course, such notice is required by statute, or unless the assignment is of only a part of the debt. The general rule is that garnishment, like other proceedings in invitum, affects only the actual property, money, credits and effects of the debtor in the hands of the garnishee, and the rule relating to bona fide holders or purchasers without notice has no application." Numerous cases from the States and England are cited, and an inspection of these citations sustains the text. The reason for the rule is stated in *Smith* v. *Texas etc. Ry. Co.,* (Tex.), 39 S. W. 969, 971. We think the rule stated is based on sound reason.

We have no statute which would require recordation of an assignment, legal or equitable, of a chose in action. Section 5, chapter 74, Code, does not apply. We have construed that section to apply to "goods and chattels" which are visible, tangible and movable, and not to include a mere chose in action, such as a debt, or claim on another for money due. *Tingle* v. *Fisher*, 20 W. Va. 497. See *Gordon* v. *Rixey*, 76 Va. 694. The Wallace fund was sequestered by garnishment without the knowledge of either the Lumber Company or appellants; and the latter not being parties to that proceeding are not bound by it. Equity has jurisdiction to restore that fund to its equitable owners, and the trial chancellor erred in not so decreeing.

We next consider the "Kanawha Valley Bank fund." What we have said will apply with equal force to that fund, if appellants have not by their conduct waived their equitable assignment thereof. The conduct which appellee says spells waiver of the lien is the manner in which the Pigeon Creek money was deposited and used by Treasurer Robson for the Lumber Company. The funds so derived were deposited in the general checking account of the Lumber Company and mixed with other moneys from other sources, and checks drawn thereon not only to pay the $12,000.00 applied to the four $5,000.00-notes, and payment of interest on the remainder of appellants' obligations ($28,000.00), but also used to pay other items of general expense. In other words, the Pigeon Creek funds were not promptly applied to the discharge of the obligation to which it was appropriated, but some of it was diverted. The amount so diverted was about $3,542.65. Robson says this was paid out on pressing demands for the preservation of the Lumber Company's property, such as taxes, and that the remainder of incoming payments from the Pigeon Creek timber were amply sufficient to discharge appellants' debts and which would have been discharged had the funds not been stopped by garnishment. The total sum received and to be received from the sale of the timber was about $47,764.48 and this would have covered appellants' debt of $40,000.00 and interest to which it was appropriated, as well as the sum used for other purposes, leaving a substantial sum

over. This fact would not impel conclusion of waiver or abandonment of the lien by appellants. Judge Campbell knew nothing of the handling of the funds until just prior to the institution of this suit. All say they would not have loaned money to pay the federal .taxes, without appropriation of the timber proceeds to secure them, and all deny any intention of releasing this assignment of that money. The intent to waive or abandon a lien must be shown by clear and convincing proof. The presumption is against waiver or abandonment. *Lambert* v. *Nicklass,* 45 W.. Va. 527, and cases there cited. Appellee relies upon the inferences to be drawn from Robson's acts in handling the fund. These acts do not impel a finding of intentional waiver. The court erred in not decreeing the "Kanawha Valley Bank fund" to appellants.

Whether appellee obtained lien by its garnishment of the Kanawha Valley Bank fund is immaterial, for granting that it did so, its lien is inferior to that of appellants. Appellants' claim of subrogation to federal lien for taxes is not tenable. They did not pay that debt. They loaned money to the Lumber Company and the latter paid it. The decree will be reversed, plaintiffs' bill reinstated and the cause remanded for further proceedings in accordance with the principles of law herein announced. .

*Reversed; bill reinstated; remanded.*