## HARDING v. FEDERAL NAT. BANK.

## FEDERAL NAT. BANK v. HARDING.

Circuit Court of Appeals, First Circuit.
April 1, 1929.

Nos. 2301. 2302.

Frederick W. McEnery, of Boston, Mass., for plaintiff.

Joseph P. Fagan and James E. Cotter (of Cotter & Fagan), both of Boston, Mass., for defendant.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. These are cross-appeals. The appellant in No. 2301 and the appellee in No. 2302 is the trustee in bankruptcy of Frank E. Wing, against whom an involuntary petition in bankruptcy was filed on the 12th day of August, 1922, and who was adjudicated a bankrupt on October 18, 1922. In December, 1922, the trustee brought a bill in equity against the Federal Trust Company, of which the present defendant, the Federal National Bank, is its successor, to recover an alleged preference under section 60 (b) of the Bankruptcy Act (11 USCA § 96(b), setting out that within

four months prior to the filing of the petition Wing, while insolvent and indebted to the defendant and other creditors of the same class upon unsecured indebtedness, and well knowing such insolvency, made "a transfer of portions of his property to the said defendant by executing a mortgage" thereof; that "said mortgage was to secure an indebtedness * * * of $94,631.34, which said indebtedness was at that time owing"; that "the effect of said mortgage * * * was to enable the said defendant to .obtain a greater percentage of its debt than any other creditor of said bankrupt of the same class * * * and that said mortgage did thus operate as a preference under the provisions of the Bankruptcy Act of 1898 and amendments thereto"; and that "the defendant received said mortgage knowing or having reasonable cause to believe that it was receiving a preference." The prayer was that the mortgage (dated May 25, 1922, and duly recorded May 26, 1922) be decreed to be preferential; that an accounting be had; and that the proceeds realized upon a sale of the mortgaged goods be declared the property of the bankrupt's estate, free from any liens or any right, title, or interest therein by the defendant. The trial proceeded upon the allegations of the bill—that the mortgage was a preference, a new security given for an old debt.

In the course of the trial (Record, p. 64) counsel for the defendant said: "I don't know what he [the plaintiff] is going to base his claim on." To this the court replied: "Why, his claim is perfectly apparent from the pleadings, that this was a preference; new security given for an old debt. He says your trust receipts and your warehouse receipts were no good; therefore, when on May 25, 1922, you got a mortgage for an old debt, that was a preference. You can't say it any clearer. * * * That is the whole thing in this case." The trial having been completed in 1924, a decree was entered, January 23, 1928, that the mortgage be set aside and that the plaintiff recover the sum of $76,569.31, with interest ($18,019.31) from the date of the decree, making in all $94,588.-62. It is from this decree that these cross-appeals are taken.

Frank E. Wing was a dealer in Marmon automobiles, with his place of business in Boston. His business in the handling of cars was financed in part by the defendant's predecessor, the Federal Trust Company, in the following manner: The Nordyke & Marmon Company, the manufacturers of the cars, shipped them to Boston. A bill of lading running to the order of the shipper and indorsed by it in blank, with a draft attached drawn on Wing, was sent to the Federal Trust Company, attention of Wing. When the cars arrived .the trust company paid the draft. Wing then gave the trust company a bank acceptance, which was a draft drawn by him upon it for the amount of the shipment, payable to himself, indorsed by him, and accepted by the trust company. He then took the bill of lading, obtained the cars from the railroad, took them to a warehouse, and obtained therefrom warehouse receipts, on each of which was described by number a particular car, being one of those described in the bill of lading. These warehouse receipts he then delivered to the trust company. The draft paid by the bank on every shipment represented the full invoice price of every car in that shipment. In the warehouse receipts M. Stearns, the warehouseman, stated:

"Received for account of Federal Trust Company, Boston, Massachusetts, Marmon 10210089." The only variation in the receipts given was in the number of the car.

The place set apart for the storage of these cars was in the basement of a building, the first floor of which Wing occupied as a salesroom. M. Stearns, who signed the receipts as warehouseman, was an employee of Wing. She kept a book in which each car received by her for storage was described by its number, and the number so recorded corresponded with the number in the warehouse receipt issued for such car and delivered to the bank. When a car was wanted by Wing for display in his salesroom, or for demonstration purposes, he gave to the bank a trust receipt for it, and received from the bank a warehouse receipt or delivery order upon which he received the car specified in it. The following is a copy of a trust receipt given by Wing:

"Trust Receipt.

"April 21, 1922.

"Federal Trust Company, Boston, Mass.

"Gentlemen: In consideration of acceptance No. 4524 due 5/8/22, $3,729.13 made for my account I hereby agree to hold the following goods in trust for you and as your property, to wit: Marmon car No. 15220126 for demonstrating purposes with liberty to sell the same for your account, and further agree, in case of sale, to hand the proceeds to you to apply against your acceptances on my account, and for the payment of any other indebtedness of mine to you.

"You may at any time cancel this trust

and take possession of said goods or of the proceeds of such of the same as may then have been sold wherever the said goods or proceeds may then be found, and in the event of any suspension, or failure, or assignment for the benefit of creditors, on my part, or of the nonfulfillment of any obligations and of the nonpayment at maturity of any acceptances made by you for my account hereunder, all obligations and acceptances whatsoever shall thereupon (with or without notice) mature and become due and payable. These goods while in my hands shall be fully insured against loss by fire and insurance certificates in your favor placed in your possession."

The provisions of all the trust receipts, except as to the number of the acceptance, the amount due thereon and the number of the car, were the same, and all were signed by Wing.

There was evidence that Wing had at times taken a car from the warehouse without first having obtained permission from the trust company. In such cases he afterwards obtained from the bank a delivery order or the warehouse receipt for such car and gave it to the warehouseman; but the regular method of doing the business in obtaining a car from the warehouseman was by first giving the bank a trust receipt, and obtaining therefrom a warehouse receipt or a delivery order for the car desired, in the manner above described.

Wing in selling cars sold them by sample and took orders for cars like the sample. When cars were paid for by a customer the money was paid to the bank that day, if the bank was open, if not, the next day.

On May 25, 1922, the mortgage here in question was taken in the place of the warehouse receipts and trust receipts then held by the bank. It covered the specific cars described in those receipts and was for the amount due thereon and paid by the trust company.

Subsequent to May 25, 1922, 15 of the cars and 4 car bodies, described in the mortgage, were released on payments made by Wing to the trust company at various times prior to August 12, 1922, aggregating $51,311.46. On August 10, 1922, the trust company removed all of the remaining cars and a car body described in the mortgage from Wing's premises and took them into its possession. Two days later the petition in bankruptcy was filed. Later, by agreement between the receiver and the bank, the bank sold the remaining cars for $25,257.85. It is for the aggregate of these sums received by the bank for the cars included in the mortgage, with interest, that judgment was rendered.

As above stated the mortgage was given to secure the amount paid by the trust company for the cars and car bodies included therein, and this amount was represented in a demand note. The mortgage contained a clause providing that Wing, the mortgagor, "shall not, except with the consent in writing of the grantee or its representatives, attempt to sell or to remove from Suffolk or Middlesex counties the same [the goods mortgaged] or any part thereof." Also a clause stating that in case of default in the performance of the condition of the mortgage, "the grantee or those claiming under it may take immediate possession of said property."

In the court below, after reciting these facts, the court stated in its opinion and findings that there were three fundamental questions in the case: (1) Was the chattel mortgage an exchange of one good security for another and therefore valid? (2) If not, did it constitute a preference? And (3) if it was not a preference, was it invalid because under it sales were made without other notice to creditors than the recording of the mortgage?

As to the warehouse receipts, it held that they did not give the trust company any rights superior to those of the trustee, on the theory advanced by the same court in McPherson v. Mass. Trust Co. (D. C.) 291 F. 676, to the effect, that by the course of business pursued in the handling of the cars the trust company under the warehouse receipts did not retain actual or constructive possession of the cars; in other words, that there had been an attempted pledge of the cars by Wing to the bank through the warehouse receipts, but that, due to the method of handling the cars after they came into the possession of the warehouseman, the bank had failed to retain actual or constructive possession of them and therefore lost its lien.

As to the trust receipts, it held that inasmuch as the bill of lading for each shipment of cars was handed to Wing to obtain the cars and take them to the warehouse and was not redelivered to the bank, that the bank did not retain title to the cars as security for its loans, although warehouse receipts for the cars were at once delivered to the bank, and consequently that the trust receipts which "were given with the idea of continuing a lien which the defendant supposed it had secured to itself by the use of the warehouse receipts," were of no more validity than if one of them had read: "The Federal Trust

Company has loaned to F. E. Wing $1,000 on Marmon car No. 1,000,000, which he promises to repay on the sale of said car."

Having held that the warehouse receipts and the trust receipts were invalid, the court concluded that their surrender in exchange for the chattel mortgage was not a present valuable consideration and gave no validity to the mortgage, which was given within four months of the filing of the petition in bankruptcy.

With this disposition of the first point, it then took up the question whether the mortgage, having been given within four months, constituted a preference. As to this it found as a fact "that on May 25, the date of the mortgage, the Federal Trust Company did not have information requiring it to make an investigation, which would have disclosed the insolvency of Wing." It did not specifically find that Wing was insolvent on that date, but the clear inference from the above finding is that it so found.

It then took up the third question, whether the mortgage was "invalid because under it sales were made without other notice to creditors than the recording of the mortgage." Under this heading it stated that the mortgage contained "a clause allowing the sale, on the written authority of the mortgagee of the cars covered by it." As to this it ruled as a matter of law that the mortgage was fraudulent; that as the bank, by this clause in the mortgage, had allowed Wing to appear as if he were the real owner, it was estopped to show as against the trustee in bankruptcy that he was not the true owner. In other words, the court applied the doctrine of reputed or ostensible ownership, and held as a matter of law that the mortgage was invalid.

■ If the third question was, on the pleadings in the case, open for consideration, the decision/made was erroneous. The doctrine of ostensible or reputed ownership is not recognized in Massachusetts, the place where these transactions were had (Blanchard v. Cooke, 144 Mass. 207, 11 N. E. 83; Fletcher v. Powers, 131 Mass. 333; Sleeper v. Chapman, 121 Mass. 404); and, in like circumstances, this court has followed the decisions of that court (Federal Finance Corp. v. Reed [C. C. A.] 296 F. 1; Guaranty Security Corp. v. Reed [C. C. A.] 299 F. 265). Then, again, the mortgage, which was properly recorded, was constructive notice to all persons of its terms and the retention of possession by the mortgagor; and permission to sell, if given, was not as a matter of law fraudulent and did not invalidate the mort-

gage. The clause in the mortgage was only such as was common in mortgages in Massachusetts and elsewhere, and was evidently inserted as a consequence of the enactment of the provision contained in Gen. Laws Mass. c. 266, § 83, which makes it a criminal offense for a mortgagor of chattels to sell the same without the written consent of the mortgagee, and in section 82 of that chapter making it an offense to remove or conceal the same.

■ The main question raised by the plaintiff under its assignments of error on its cross-appeal is as to the finding of fact by the court below "that on May 25, the date of the mortgage, the Federal Trust Company did not have information requiring it to make an investigation, which would have disclosed the insolvency of Wing." His contention is that the trust company had the information necessary to require it to make an investigation as to Wing's solvency, and, having failed to do so, it is charged with knowledge of what it would have found.

The evidence on this question was conflicting and the weight to be given to it depended largely on the credibility of the witnesses. The District Court had the witnesses before it and was able to judge, as we are not, whether their testimony was truthful. In such a situation this court has many times held that it will not set aside the finding of the lower court, for the reason that it is not in a position to say that the finding of the court below was clearly wrong.

■ In this posture of the case—the ruling of the District Court as to its third question being erroneous and its finding of fact on the second being sustained—the plaintiff's bill should be dismissed, whether the court's rulings and findings as to the first question were correct or otherwise; the latter rulings and findings were in the plaintiff's favor and he cannot complain of them.

■ We are, however, of the opinion that the decision of the first question should have been in favor of the defendant; that on the evidence it should have been found that the title to the cars did not pass from the trust company to Wing when it handed him the bill of lading to procure the cars, deliver them to the warehouseman, obtain warehouse receipts, and at once deliver the warehouse receipts to the trust company or a trust receipt or receipts for such car or cars as were to be taken into his possession. The evidence shows that the delivery of the bill of lading simply was to accomplish a specific purpose, to wit, the removal of the cars from the railroad to the warehouse and a substitution of

warehouse receipts or trust receipts for the bill of lading. The intention not to pass title to Wing is also shown in each warehouse receipt. The warehouseman there acknowledges that she holds the specific car described in the receipt for the account of the trust company. The same purpose and intention not to pass title to Wing is further shown by the agreement in the trust receipts, in which Wing specifically agrees "to hold the following goods in trust for you [the trust company] and as your property," then describing the car. The taking of the bill of lading by Wing, the procurement of the cars, the delivery of them to the warehouse, the porcurement and delivery of warehouse receipts and trust receipts to the bank, were all a part of one transaction, and show the intent and purpose actuating the parties participating therein and clearly demonstrate that their intention was that the title to the cars should remain in the trust company, and that the warehouseman and Wing in what they did and were to do were acting respectively as bailee and agent for the trust company. Ludvigh v. American Woolen Co., 231 U. S. 522, 528, 34 S. Ct. 161 (58 L. Ed. 345). The warehouse and trust receipts were the indicia of the trust company's title to the cars and a substitute for the bill of lading. It therefore cannot be said that on the 25th of May, 1922, when the trust company delivered these receipts to Wing and received in return a mortgage on the specific cars for the amount advanced by it in their purchase, that it did not give a present valuable consideration for the mortgage. There was no element of fraud in the transaction. The trust company held the title to the cars, transferred it to Wing and took back a mortgage for money it had actually advanced when it took title. As there was a present valuable consideration given for the mortgage at the time it was executed the mortgage was valid, not a preference, though made within the four months' period, and, being valid, the plaintiff's petition should be dismissed.

■■ There is still another ground for sustaining the trust company's right to the proceeds derived from the sale of the cars. If it be assumed that the title to the cars passed to Wing on the delivery to him of the bill of lading, and that the delivery of the cars to the warehouseman and of the warehouse receipts to the bank was a pledge of the cars to the bank as security for the money it advanced for their purchase, which failed because the trust company did not continue in the actual or constructive possession of the cars, it does not follow that the trust company did not have an equitable right to the cars. On such a state of facts it unquestionably had an equitable lien on each car for the amount advanced in its purchase. Mass. Trust Co. v. MacPherson (C. C. A.) 1 F.(2d) 769. Some of the cars were purchased by money advanced by the trust company prior to the four months preceding the filing of the petition in bankruptcy and some during the four months' period. The mortgage given within four months was not a waiver by the trust company of its equitable right to or lien on these cars but a recognition of it. If the mortgage be disregarded, still as the trust company, in the exercise of its right so to do, took possession of the cars prior to the filing of the petition, such taking of possession was not the creation of a new right, but related back to the time when the equitable lien arose and was in confirmation of it. The trust company had an equitable lien on the cars purchased within the four months period, as well as those purchased prior thereto. These transactions did not diminish the bankrupt's estate. The lien upon such cars was valid when it was created, and the subsequent taking of possession by the trust company was not the creation of a new right.

Therefore, assuming that the title passed to Wing on the delivery of the bill of lading—as it appears that the trust company had an equitable lien on the cars, which accrued as of the time the money was advanced, and that the trust company took possession, in the assertion of its right, before the petition in bankruptcy was filed—it follows that, so considered, the case is ruled by our decision in Mass. Trust Co. v. MacPherson, 1 F.(2d) 769, and that for the reasons there given the plaintiff's petition must be dismissed.

■ The plaintiff, in his brief and at the argument, has taken the position that the mortgage of May 25th was given by Wing with the intention and purpose of hindering, delaying, and defrauding his creditors, and that the trust company knew of such purpose. Such a contention is wholly groundless. But, if it had a semblance of merit, the question which he seeks to raise is not before us, for as pointed out in the early part of this opinion, no such question is presented by the pleadings in the case, and no such question was tried in the District Court.

■ In so far as the plaintiff's assignments of error, filed March 28, 1928, are not covered by the above discussion of the case, we find no merit in them. There is a further reason why he takes nothing by any of his assignments of error, whether filed then or

at a later time. It appears that the decree appealed from was in his favor and granted him all the relief he sought. His cross-appeal was therefore improperly taken (Corning et al. v. Troy Iron & Nail Factory, 56 U. S. [15 How.] 451, 464, 465 (14 L. Ed. 768); Guarantee Co. of North America v. Phenix Ins. Co. [C. C. A.] 124 F. 170, 173), and, such being the case, it was not open to him to assign or argue cross-errors (Rogers v. Penobscot Mining Co. [C. C. A.] 154 F. 606, 609).

In No. 2301, the appeal is dismissed with costs.

In No. 2302, the decree of the District Court is vacated, and the case is remanded to that court, with directions to dismiss the plaintiff's bill, with costs in both courts.

ANDERSON, Circuit Judge, concurs in the result.