## UNION TRUST CO. OF MARYLAND v. TOWNSHEND (two cases).

### In re SMITH.
### Nos. 4370, 4386.

Circuit Court of Appeals, Fourth Circuit.
Feb. 23, 1939.

SOPER, Circuit Judge, dissenting.

Walter H. Buck, of Baltimore, Md. (Frank Lively, of Charleston, W. Va., on the brief), for appellant.

Selden S. McNeer, of Huntington, W. Va. (Campbell & McNeer, of Huntington, W. Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a controversy arising in the bankruptcy proceedings of R. Smith, who was adjudged a bankrupt December 23, 1931, on an involuntary petition filed November 30, 1931. The controversy relates to bonds of the Columbia Gas and Electric Company of the par value of $72,000, received by one C. M. Gohen on November 25, 1931, from the sale of Smith's one-third interest in gas properties in Kentucky and West Virginia owned by him jointly with the estate of T. E. Houston.

For some time prior to March 4, 1931, Smith and his co-owner had been attempting to sell these gas properties. They had been offered $2,000,000 for them at one time, but had rejected the offer. Smith's interest was subject to mortgages aggregating approximately $300,000 in favor of the First Huntington National Bank and the Union Bank and Trust Company of Huntington, West Virginia; and Gohen, the president of the first named bank, was representing him in attempting to secure a sale of the properties. On November 18, 1930, Smith and his co-owner had executed a power of attorney to Gohen and one Julius Frieberg of Cincinnati authorizing them to sell and convey the properties, Frieberg being named in the power of attorney because he was representing the Houston interests and Gohen because he was representing Smith.

Smith was indebted at this time to the Farmers & Merchants National Bank of Baltimore, Maryland, later merged with the Union Trust Company of that city, in the sum of $72,000, secured by the pledge of 1600 shares of the capital stock of the First Huntington National Bank. This stock was worth at the time more than the amount of the debt. The debt was past due and the bank was pressing for payment; but Smith, although unable to pay, was unwilling for the stock to be sold, and Gohen did not wish so large a block of it to be thrown on the market. They accordingly secured from the Baltimore bank an extension of time for the payment of the indebtedness, by an agreement on the part of Smith that the debt of the bank should be paid from the proceeds of the sale of his interest in the gas properties, and on the part of Gohen that he would pay the debt of the bank from such proceeds when same should come into his hands. The agreement of Smith was contained in a letter addressed by him to Gohen, mistakenly bearing date of February 4, 1931, but in reality written March 4, 1931. It is as follows:

"You have a power of attorney to represent me in the sale of the Houston-Smith gas properties in Kentucky and West Virginia and your Bank, the First Huntington National, and the Union Bank & Trust Company hold mortgages against my undivided one-third interest in this property for approximately $300,000.00 as evidenced by my note as maker, and endorser on other notes in the two banks. I am due the Farmers and Merchants National Bank of Baltimore, Maryland, $72,-000.00, evidenced by my note with collateral attached of 1600 shares of First Huntington National Bank stock.

"I want to pay this note out of the sale of the gas property, rather than to be forced at this time to have a sale made of this bank stock. I am hereby authorizing you to pay this note, if acceptable to the Farmers and Merchants National Bank, from the moneys received from the sale of this gas property, and authorize you to provide in the sale of the property that the total amount of $372,000.00, which covers the amount due your bank, the Union, and this $72,000.00 note, be paid direct to the First Huntington National Bank for the purpose of discharging the indebtedness above set out."

This letter was sent by Gohen to Gideon, an officer of the Baltimore bank, agreeing to pay over to that bank the money "if and when" it came into his hands. The letter of Gohen is as follows:

"In accordance with our telephone conversation this morning, I am enclosing you herewith the letter from R. R. Smith, addressed to me, dated today, in which Captain Smith agrees to pay your note for $72,000 out of the sale of the Houston-Smith gas properties when and if such properties be sold.

"For your information, the prospect of selling the property seems more hopeful than it has been for sometime. The value placed on the property about one year ago by Ralph E. Davis, a reputable engineer, was $1,940,000, and based upon this engineer's report a cash offer was made by the United Fuel Gas Company of $2,000,000, which was refused by the Houstons and Smith—their idea of the value being around $3,000,000. Subsequently, the property was offered in all of the markets of the country and became somewhat discredited as a result.

"*Several months ago, Smith gave the writer an absolute power of attorney to represent his one-third interest in any negotiation for the sale,* and I purposely had the property withdrawn from the market until the situation caused by the frantic efforts of Smith to sell at an exorbitant price had cleared away. On February 28, I gave some people in New York in whom I have confidence until the 15th of March to handle the proposition, at a price which should make it attractive to the purchaser. I feel confident that some sort of a proposition will be acceptable to the Houstons and myself will result from this move.

"Smith would like to renew the note which he has with you for thirty days, and I believe that if a sale of the gas properties is effected within that time, you will shortly thereafter receive your money. The times are certainly not propitious for the block of bank stock which you hold to be placed upon the market. It can, of course, be sold at a price, but I believe it would be much more to your interest, as well as that of Captain Smith, to renew the paper for thirty days and see how matters work along on the sale of the gas property.

"If it is agreeable to you to renew the paper for thirty days, you may send me one of your collateral forms and I will have it executed by Captain Smith and returned to you with the interest. *You may also return to me the enclosed letter and I will accept the same and agree to pay to you the money if and when it comes into my hands.*" (Italics supplied.)

Relying upon the promises contained in these letters, the Baltimore bank extended the time of payment on the debt represented by Smith's note from time to time and refrained from forcing collection until the bank stock pledged as collateral had so declined in value as not to be worth the amount of the debt.

On April 16, 1931, Smith executed an instrument revoking the power of attorney granted Gohen and Frieberg, but no notice was given the Baltimore bank of the revocation and Gohen continued to assist Smith in attempting to procure a sale of the property and had frequent communication with the bank as to the prospect of selling it. Not only was no notice given the bank of the revocation of the power of attorney, but letters were written from time to time advising the bank of the progress being made towards consummating a sale. Thus on August 4th, Smith wrote the bank as follows:

"I had a statement sometime back of the interest due you on my note, which I have not remitted for the reason that I have been so hard up I could hardly get my breath.

"The sale of our gas property has been agreed upon and it's now only a matter of working out details, which should be completed in the next few days, at which time I will have you send my note, with the collateral and the order I gave you to Mr. Gohen on the funds to be derived from the sale of the gas property in payment of this note.

"I hope this will be satisfactory and that you can clearly see your way to let this matter ride until this sale is completed. Mr. Gohen will verify my letter to you in regard to this."

On August 6th, Gohen wrote the bank as follows:

"I have just returned from a two week's vacation. Prior to my leaving Mr. Short, of the Houston interests, went to Charleston and had a very satisfactory interview with Mr. Wallace of the United Fuel Gas Company, and as a result of their negotiations during my absence a proposition was made by Wallace to buy the property for $1,500,000 and to pay for it with Columbia Gas & Electric Company 5% Gold Debenture Bonds of April 15, 1952, the bonds to be accepted by the owners at par. Letters to this effect were exchanged between the United Fuel Gas Company, the Houston interests and Captain Smith, and the deal is unquestionably made, subject, of course, to the approval of the legal department of the United Fuel Company.

"The attorneys are busily engaged in abstracting and checking the leases and this work should be completed early next week; it will then be submitted to Judge Ritz, Chief Counsel for the United Fuel Gas Company, and as we anticipate no trouble as to titles, etc., the transaction should be closed within the next week or ten days.

"Smith, meanwhile, is arranging to turn into cash the $500,000 of bonds which will be coming to him. After the payment of the mortgages, amounting to approximately $300,000, the first mortgage being held by our bank and a second by the Union Bank and Trust Company, this city, and the payment of the Houstons of a preferred claim of approximately $75,000, Smith will have around $125,000 out of which he has authorized me (provided I am disbursing agent) to pay your note with interest.

"I sent for Smith today and talked the matter over with him, and he has authorized me to wire you just as soon as I can ascertain the date upon which the deal will be closed to forward to us your note with the collateral, for collection. So far as I can see, there does not appear to be anything to prevent the closing of this deal, other than unexpected title difficulties. There is one judgment of record against him for $500 and one suit pending for approximately $10,000. which I do not think will mature and be reduced to judgment before the sale is consummated. Therefore, it would seem to me that the best thing for your bank is to be patient for the next ten days or so and you should receive your money.

"Smith is very anxious to retain his stock in our bank, or at least to prevent its sale at this time, and you may be assured that I will do all possible to obtain the payment of your note as quickly as it can be accomplished."

Other orders were given by Smith on the funds to come into the hands of Gohen from the sale of the property; but it is unquestioned that the order in favor of the Baltimore bank was the first given.

The negotiations with the United Fuel Gas Company and the Columbia Gas and Electric Company were continued and finally culminated in a sale which was closed on November 25th. Gohen, who had gone to New York to close the transaction, received as Smith's part of the proceeds of sale $387,000 of bonds of the Columbia Company, $315,000 of which he applied to the debts due the two Huntington banks and $72,000 of which he intended to turn over to the Baltimore bank under the agreement above mentioned. He was prevented from delivering them to that bank, however, by an attachment levied upon them at the instance of certain other creditors of Smith. Petition in bankruptcy was filed five days later, and the attachment proceedings were dismissed and the bonds were delivered to the trustee in bankruptcy under an agreement that they were to be held by him without prejudice to the rights of the Baltimore bank. Petition was then filed by the bank with the bankruptcy court setting up claim to the bonds under the agreement evidenced by the letters above referred to, and ask-

ing that they be sold and the proceeds applied so far as necessary to the payment of the debt after the application thereon of the proceeds of the bank stock pledged as collateral. The court below held that there was no valid assignment of the proceeds of sale in favor of the bank, nor any valid lien created in its behalf with respect thereto, and dismissed the petition.

Upon the evidence in the record, there can be no doubt but that Smith was granted an extension of time by the Baltimore bank because of the agreement that it should be paid by Gohen out of the proceeds of the sale of the gas properties; that thereafter the bank looked to the sale of these properties for payment; that all parties, including Smith and Gohen as well as the bank, regarded the order contained in the letter of March 4th as still in force and binding upon Gohen when the sale of the properties should be made; that Gohen was holding the $72,000 of bonds for the bank under that power following their delivery to him; and that he would have delivered them to the bank promptly if attachment had not been levied upon them. On the other hand, it is equally clear that no exclusive agency on the part of Gohen to sell the property is shown; that the power to sell it remained in Smith notwithstanding the power granted Gohen; and that not until the sale was made and the proceeds came into the hands of Gohen was there a fund or property as to which the agreement contained in the letters was applicable.

 We agree that until the receipt by Gohen of the funds derived from the sale no lien arose with respect to the property of Smith. It was not placed beyond the control of Smith until the sale, and his agreement that the debt of the Baltimore bank should be paid from the proceeds of sale was, until the sale was made and the proceeds received by Gohen, no more than an agreement to pay the debt out of a particular fund, which of itself gives rise to no lien. Lone Star Cement Corp. v. Swartwout, 4 Cir., 93 F.2d 767; Christmas v. Russell, 14 Wall. 69, 20 L.Ed. 762; State Central Savings Bank v. Hemmy, 8 Cir., 77 F.2d 458, 460; Arnold v. Buckhannon Bank, 116 W.Va. 589, 183 S.E. 52. When the funds were received by Gohen from the sale, however, a different situation arose. They were not under the unfettered dominion and control of Smith as the property had been, but were held by Gohen subject to the positive agreement on his part as well as on the part of Smith that he should apply them pro tanto upon the debt of the bank. This was not merely an agreement on the part of Smith to pay the debt from the fund, but an appropriation of the fund pro tanto for that purpose, and an agreement on the part of Gohen to respect the appropriation and to pay the debt of the bank out of the funds coming into his hands. State Central Savings Bank v. Hemmy, supra; B. Kuppenheimer & Co. v. Mornin, 8 Cir., 78 F.2d 261, 265, 101 A.L.R. 75. There can be no question, we think, but that, in the absence of bankruptcy, a court of equity would hold the funds impressed with a trust or equitable lien under the agreement and would direct their application in accordance therewith.* The rule applicable is that quoted by Mr. Justice Harlan from the opinion of the Circuit Judge in Ketchum v. St. Louis, 101 U.S. 306, 307, 25 L.Ed. 999, as follows: "If a debtor by a concluded agreement with a creditor sets apart a specific amount of a specific fund in the hands, or to come into the hands, of another from a designated source, and directs such person to pay it to the creditor, which he assents to do, this is a specific appropriation binding upon the parties and upon all persons with notice who subsequently claim an interest in the fund under the debtor."

 The generally accepted doctrine regarding equitable liens is thus stated by Professor Pomeroy, 3 Pomeroy's Equity Jurisprudence, 4th ed., sec. 1235: "The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises

---

* The difference between an equitable assignment and an equitable lien is pointed out by Judge Gardner in Tobin v. Insurance Agency Co., 8 Cir., 80 F.2d 241, 243. An equitable lien is a charge upon property while an assignment creates an interest therein. As the funds received by Gohen were in bonds and not cash which might be applied directly to the bank's debt, it is an equitable lien or charge rather than an equitable assignment that was created with respect thereto.

to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. Under like circumstances, a merely verbal agreement may create a similar lien upon personal property. The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done. In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation."

And Professor Pomeroy points out that this doctrine applies to property to be acquired in the future, as well as to property in existence at the time of the agreement. The rule is stated by him in section 1236 as follows: "The doctrine is carried still further, and applied to property not yet in being at the time when the contract is made. It is well settled that an agreement to charge, or to assign, or to give security upon, or to affect property not yet in existence, or in the ownership of the party making the contract, or property to be acquired by him in the future, although, with the exception of one particular species of things, it creates no legal estate or interest in the things when they afterwards come into existence or are acquired by the promisor, does constitute an equitable lien upon the property so existing or acquired at a subsequent time, which is enforced in the same manner and against the same parties as a lien upon specific things existing and owned by the contracting party at the date of the contract."

The doctrine as stated by the Supreme Court in Walker v. Brown, 165 U.S. 654, 664, 17 S.Ct. 453, 41 L.Ed. 865, and quoted with approval in United States v. Butterworth-Judson Corp., 267 U.S. 387, 393, 45 S.Ct. 338, 340, 69 L.Ed. 672, is as follows: "The doctrine may be stated in its most general form that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and purchasers or encumbrancers with notice."

In the Butterworth-Judson case it was held that deposits in a bank made subsequent to a contract that funds so deposited should be used for the purpose of discharging obligations assumed under government contract were charged with an equitable lien in favor of the government under the doctrine as stated.

In Mitchell v. Winslow, Fed.Cas.No. 9,673, 2 Story 630, Mr. Justice Story states the doctrine as to the creation of equitable liens as follows: "It seems to me a clear result of all the authorities, that wherever the parties, by their contract, intended to create a positive lien or charge, either upon real or upon personal property, whether then owned by the assignor or contractor, or not, or if personal property, whether it is then in esse or not, it attaches in equity as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto, against the latter, and all persons asserting a claim thereto, under him, either voluntarily, or with notice, or in bankruptcy."

Two cases in the Supreme Court of the United States, which are of special importance because cited with approval by the Supreme Court of Appeals of West Virginia in Hines v. Fulton, 92 W.Va. 204, 114 S.E. 684, 687, are Sexton v. Kessler & Co., 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995, and Barnes v. Alexander, 232 U.S. 117, 34 S.Ct. 276, 277, 58 L.Ed. 530, in both of which the decisions were by a unanimous court with opinions written by Mr. Justice Holmes. In the first of these cases, an equitable lien was enforced on securities which were retained in possession of a debtor until shortly before the bankruptcy on the ground that the debtor had agreed to set them aside and hold them as security for the creditor. In Barnes v. Alexander an equitable lien was declared on funds received by attorneys as fees because of an agreement that one-third of the funds when received should be paid

to another attorney for services rendered. In upholding the lien under this agreement the court said:

"Barnes gave no general promise of reward; he did not even give a promise qualified and measured by success to pay anything out of his own property, referring to the fund simply as the means that would enable him to do it. See National City Bank v. Hotchkiss, 231 U.S. 50, 57, 34 S.Ct. 20, 58 L.Ed. [115]. He promised only that if, when, and as soon as he should receive an identified fund one third of it should go to the appellees. But he promised that. At the latest, the moment the fund was received the contract attached to it as if made at that moment. It is an ancient principle even of the common law that words of covenant may be construed as a grant when they concern a present right. Sharington v. Strotton, Plow. 298, 308; Hogan v. Barry, 143 Mass. 538, 10 N.E. 253. * * * *And it is one of the familiar rules of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing.* Mornington v. Keane, 2 DeG. & J. 292, 313, 27 L.J.Ch.N.S. 791, 4 Jur.N.S. 981, 6 Week.Rep. 434; Holroyd v. Marshall, 10 H.L.Cas. 191, 211, 33 L.J.Ch. N.S. 193, 9 Jur.N.S. 213, 7 L.T.N.S. 172, 11 Week.Rep. 171, 10 Eng.Rul.Cas. 420.

"The obligation of Barnes was as definitely limited to payment out of the fund as if the limitation had been stated in words, and therefore creates a lien upon the principle not only of Wylie v. Coxe, supra [15 How. 415, 14 L.Ed. 753], but of Ingersoll v. Coram, 211 U.S. 335 [336], 365-368, 29 S.Ct. 92, 53 L.Ed. 208, 229, 230, which cites it and later cases. See further to the same point, Burn v. Carvalho, 4 Myl. & C. 690, 702, 703, 3 Jur. 1141; Rodick v. Gandell, 1 DeG, M. & G. 763, 777, 778, 12 Beav. 325, 19 L.J.Ch.N.S. 113, 13 Jur. 1087; Harwood v. La Grange, 137 N.Y. 538, 540, 32 N.E. 1000. It is suggested that there is an American doctrine opposed to that which is established in England. We know of no such opposition. *There is or ought to be but one rule, —that suggested by plain good sense.*

" * * * It is not necessary to consider whether the lien attached to what we have called the res, before the fund was received, as a covenant to set apart rents and profits creates a lien upon the land. Legard v. Hodges, 1 Ves.Jr. 477, 4 Bro.Ch. 421. It is enough that it attached not later than that moment." (Italics supplied.)

And this doctrine as to the creation of equitable liens is the law in West Virginia and is so declared by the highest court of that state. Foster v. Frampton-Foster Lumber Co., 96 W.Va. 325, 123 S.E. 50; Triumph Electric Co. v. Empire Furniture Co., 70 W.Va. 164, 73 S.E. 325; Knott v. Shepherdstown Mfg. Co., 30 W.Va. 790, 5 S.E. 266. In the case last cited the court quotes section 1235 of Pomeroy's Equity Jurisprudence, supra, as correctly stating the law, and states the rule in the syllabus, which is the law in West Virginia, as follows: "Every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund therein identified, a security for a debt or other obligation, or whereby the party promises to convey, assign, or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property." And that such an agreement results in the creation of an equitable lien on property to be thereafter acquired. See Triumph Electric Co. v. Empire Furniture Co., supra; Horner-Gaylord Co. v. Fawcett, 50 W.Va. 487, 40 S.E. 564, 57 L. R.A. 869.

The case of Huling v. Cabell, 9 W.Va. 522, 27 Am.Rep. 562, strongly relied upon by appellee, is not in point. That case involved the validity of the assignment of the proceeds of an agricultural fair; and the assignment was held void as being of a mere expectancy of funds which had no potential existence. The question as to whether an equitable lien existed as to the funds in controversy in that case seems not to have been raised; but if potential existence be necessary to the creation of an equitable lien in West Virginia, that element is present here. While it is true that no contract had been entered into for the sale of Smith's interest on March 4, 1931, he had authorized Gohen to sell it; and, as it was property of value, a sale was reasonably anticipated and the proceeds of sale can reasonably be said to have had potential existence. In First National Bank of Wellsburg v. Kimberlands, 16 W. Va. 555, the other case chiefly relied on by appellee, an assignment of funds to arise from the sale of land was upheld, although the price had not been agreed upon at the time of the assignment. Nothing is said

which would derogate from the validity of an equitable lien under the circumstances here existing.

The reason at the basis of the rule that a mere agreement to pay a debt out of a fund creates no lien on the fund, is that, where there is no appropriation of a part of the fund to the payment of the debt, the whole remains under the unfettered dominion of the debtor, and the failure on his part to carry out the agreement is a mere breach of contract, no different in character from his failure to pay the debt. Lone Star Cement Corp. v. Swartwout, supra; Benedict v. Ratner, 268 U. S. 353, 364, 45 S.Ct. 566, 69 L.Ed. 991. This is not true, however, of an agreement that a fund in the possession of another, or to come into his possession, shall be charged with the payment, where the person having possession, or to come into possession, agrees to respect the charge and make payment from the fund when received. Arnold v. Buckhannon Bank, supra. In such case the fund, when it arises, is no longer under the unfettered dominion of the debtor, but is subject to the control of another who has assumed an obligation with respect thereto; and equity enforces a lien thereon in application of the principle that it regards as done that which should have been done.

A case directly in point on the proposition above stated is the decision of the Supreme Court in Ketchum v. St. Louis, supra, 101 U.S. 306, 315, 25 L.Ed. 999. In that case the County of St. Louis had loaned funds to the Pacific Railroad Company under an agreement that the interest on the bonds should be paid out of the earnings of the company. In holding that an equitable lien was thus created upon the earnings, the Court, speaking through Mr. Justice Harlan, said: "It was not a simple, naked covenant to pay out of a particular fund; but the act, being accepted by the parties interested, operated as an equitable assignment of a fixed portion of that fund,—an assignment which became effectual without any further intervention upon the part of the debtor, and which the party holding the funds of the company, whether the fund commissioner or some other person, could respect without liability to the debtor for so doing. It was an arrangement, based upon a valuable consideration, which neither the State nor the company, nor both, nor parties claiming under either, with notice, could disregard without the assent of the county, expressed by those who had authority to bind it. It was an engagement to pay out of a specially designated fund, accompanied by express authority to its custodian to apply a specific part thereof to a definite object, in the accomplishment of which all the parties to the arrangement were directly interested."

And we do not think that the case is different because of the revocation of the power of attorney executed to Gohen and Frieberg. The letter to Gohen sent to him to be sent to the bank and actually sent to the bank, recognized an authority on the part of Gohen to make sale of the property and use the proceeds to the extent necessary to pay the debt of the bank. Thus, irrespective of the power of attorney to Gohen and Frieberg, an agency on the part of Gohen to sell the property was recognized and this agency was coupled with an interest on the part of the bank to have it sold and the proceeds applied on the bank's debt. Certainly, to the extent of this interest, the agency was not revocable. A. L. I. Restatement of Agency secs. 138 and 139; 2 Am.Jur. 65; Hunt v. Rousmanier, 8 Wheat. 174, 206, 5 L.Ed. 589; Knapp v. Alvord, 10 Paige, N.Y., 205, 40 Am.Dec. 241. And there was no attempt to revoke it. On the contrary, Gohen continued to cooperate with Smith in efforts to sell the property; he communicated with the bank from time to time as to the efforts being made; and he went to New York to close the deal and collect the proceeds of sale. Gohen testified that he went with Smith to Cincinnati in November 1931 when the contract of sale was drawn up and that he represented him in New York in the closing of the transaction. Smith testified that the order which he had given Gohen to pay the debt of the bank out of the proceeds of sale "was still in force when the sale was made". Whatever be the rule as to the right of Smith to revoke Gohen's authority to collect the proceeds of sale and apply same on the debt of the bank, it is clear that he made no effort to revoke it, and that under this authority Gohen collected the proceeds of sale just as was contemplated when the letters of March 4th were written.

And it can make no difference that the proceeds of sale were in the form of bonds and not money, except that equity will enforce a lien on the bonds whereas it would have directed the paying over of

the money. It is true that the letter of March 4th authorized the payment of the bank's note "from the moneys received from the sale"; but the lien thus created upon the proceeds of sale could not be defeated by accepting bonds rather than money in payment, particularly as Smith had stated in the letter that he desired to pay the note "out of the sale". Where a lien for the payment of a debt is created upon the proceeds of property which is authorized to be sold, equity will impress a lien upon the proceeds of sale even though other property be received in payment, for the parties must have contemplated that, in such event, property so received should be charged with the payment of the debt. Equity imputes the intent to fulfill an obligation and regards as done that which should have been done.

If bankruptcy had not intervened, therefore, we think there can be no question but that upon receipt by Gohen of the bonds derived from the sale of the property, same would have been impressed with an equitable lien in favor of the bank. Does the fact that bankruptcy proceedings were instituted five days after his receipt of the bonds change the situation? We do not think that it does, for the reason that the lien arose pursuant to an agreement entered into more than four months prior to the institution of the proceedings although the property to which it attached did not come into the possession of Gohen so as to be subject thereto until within the four months period. To constitute a voidable preference within the prohibition of the Bankruptcy Act there must be not merely a transfer of property but also a mental element connected therewith, viz., the person receiving it must at the time of the transfer have reasonable cause to believe that it will effect a preference. Sec. 60b, 11 U.S.C.A. 96(b); Coder v. Arts, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772, 16 Ann.Cas. 1008; Everett v. Warfield Mining Co., 4 Cir., 37 F.2d 328; In re Chicago Car Equipment Co., 7 Cir., 211 F. 638. It is the transfer to be avoided which must be accompanied by this mental element, not the acquisition of property to which the transfer attaches. Consequently, if an instrument giving rise to a lien is not affected by the statute either because given more than four months before bankruptcy or because there was no cause to believe that it would effect a preference, the lien is not avoided as to subsequently acquired property to which it attaches within the four months period, even though at that time a transfer would have been preferential; for in such case there is, within the statutory period, no transfer with reasonable cause to believe that it will effect a preference, but merely the acquisition of property to which the prior instrument attaches of its own force. Such a case is to be distinguished from a mere agreement to give a lien followed by the execution within the four months period of an instrument creating one; for in the latter case the existence of the lien depends upon the transfer within the forbidden period, whereas in the former the agreement entered into prior to that period attaches as a lien of its own force without further action by the parties. As said by Judge Severens in Union Trust Co. v. Bulkeley, 6 Cir., 150 F. 510, 516, 517, "If any contract was made, it was one which became of its own force operative as a lien. It is true that the subject to be affected by it was to be thereafter acquired; but, when acquired, it would become subject to the lien without any new or further agreement. This is something quite different from an executory contract."

The general rule is thus stated by Judge Gardner in U. S. F. & G. Co. v. Sweeney, 8 Cir., 80 F.2d 235, 239: "Equitable liens, if created before the four months period preceding bankruptcy, are valid and enforceable against the trustee, and they are not preferential even though the funds upon which they are a charge are collected after an adjudication in bankruptcy."

This rule was applied by the Circuit Court of Appeals of the Fifth Circuit in Coppard v. Martin, 15 F.2d 743, 745, to uphold a transfer of the proceeds of sales of goods to be made in the future as security for a loan. At the time of the loan and the execution of the instrument pledging the proceeds of sales to its repayment, the debtor was believed to be solvent. The proceeds of sales were received when he was known to be insolvent. In holding that a valid lien existed, the Court said: "The corporation attempted to make a present assignment of money to be received in the future. If that assignment was valid, Martin had an equitable right to the money as soon as it was paid, because of the doctrine that equity regards as done that which ought to be done. Bank of Oakman v. Union Coal Co. (C.C.A.) 15 F.2d 360 (present term). And that right related back to the date of his contract.

Sexton v. Kessler & Co., 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995."

See, also, Tobin v. Insurance Agency Co., 8 Cir., 80 F.2d 241, 243; Voltz v. Treadway & Marlatt, 6 Cir., 59 F.2d 643; Slack v. Gunerius, 7 Cir., 67 F.2d 852; Harding v. Federal Nat. Bank, 1 Cir., 31 F.2d 914; Burrowes v. Nimocks, 4 Cir., 35 F.2d 152; Goldstein v. Rusch, 2 Cir., 56 F.2d 10, 12; Atherton v. Beaman, 1 Cir., 264 F. 878, 881; In re Harvey, D.C., 212 F. 340.

Sexton v. Kessler & Co., 225 U.S. 90, 32 S.Ct. 657, 56 L.Ed. 995 is very much in point. In that case a firm of private bankers in New York, some years before its failure, agreed with defendant, its Manchester correspondent, to put aside securities to protect its indebtedness to defendant. In accordance with this agreement, certain securities consisting of stocks and bonds were placed in a package marked "Escrow for account of Kessler & Co., Limited, Manchester," which was kept in the vaults of the New York firm. A list of the securities was sent defendant; and it was agreed that the New York firm, without consulting defendant, might withdraw and sell any of the securities at any time upon replacing them with others of equal value. Within four months prior to the bankruptcy of the New York firm, and while its solvency was in doubt, it delivered the securities to an agent of the Manchester firm. After bankruptcy, suit was instituted by the trustee to recover the securities on the ground that their transfer within four months of bankruptcy constituted a preference in violation of the Bankruptcy Act, 11 U.S.C.A. The right of the defendant in the securities was sustained on the ground that it had acquired right thereto under the original contract and setting aside by the bankrupt, and that consequently the delivery within four months of the bankruptcy did not constitute a voidable preference.

In the Circuit Court of Appeals of the Second Circuit, the case was heard before Judges Lacombe, Ward, and Noyes, all of whom agreed that the claim of the defendant to the securities should be sustained. The majority of the court, composed of Judges Lacombe and Noyes, in an opinion by Judge Noyes (172 F. 539, 544, 545, 40 L.R.A.,N.S., 639), held that the rights of the defendant were perfected as against creditors by the delivery and that same related back to the original transaction, under which the securities were set aside, and validated it as a pledge. They held, further, that the perfecting of the lien of the pledge by the delivery could not under the circumstances be held the giving of a preference, relying upon Thompson v. Fairbanks, 196 U.S. 516, 25 S. Ct. 306, 49 L.Ed. 577, and Humphrey v. Tatman, 198 U.S. 91, 25 S.Ct. 567, 49 L.Ed. 956, to support this conclusion. Judge Noyes said, with reference to these cases: "While the Supreme Court in the cases referred to treats the validity of the mortgages and the rights of the mortgagees thereunder to be matters of local law, in my opinion it also states this underlying and controlling distinction: The exercise of a pre-existing right well founded in equity is not a preference, although occurring within the prescribed period."

In the Supreme Court the decision of the Circuit Court of Appeals was affirmed, the Court saying: "While the phrase 'equitable lien' may not carry the reasoning further or do much more than express the opinion of the court that the facts give a priority to the party said to have it, we are of opinion that the agreement created such a lien at least; or in other words, that there is no rule of local or general law that takes from the transaction the effect it was intended to produce. Hurley v. Atchison, Topeka & Santa Fe Ry. Co., 213 U.S. 126, 134, 29 S.Ct. 466, 53 L.Ed. 729, 734. When the English firm took the securities it only exercised a right that had been created long before the bankruptcy, and in good faith. Such we understand to be the law of New York; and in the absence of any controlling statute to the contrary such we understand to be what the law should be. Parshall v. Eggert, 54 N.Y. 18; National Bank of Deposit v. Rogers, 166 N.Y. 380, 59 N.E. 922." [225 U.S. 90, 32 S.Ct. 659.]

The rule that an agreement creating an equitable lien, not preferential at the time of the agreement, does not become preferential because of the condition of the debtor at the time that it attaches* to subsequently acquired property, is analogous to the rule relating to the registration within the four months period, of chattel mortgages void as against lien creditors until registered. See In re Cunningham, 4 Cir., 64 F.2d 296, 299. It is analogous, also, to the rule applied where the creditor takes possession of the property under such a mortgage. See Finance & Guaranty Co.

v. Oppenhimer, 276 U.S. 10, 48 S.Ct. 209, 72 L.Ed. 443. In such cases the preferential nature of the transfer is to be judged as of the date of the basic agreement under which the lien was created by the parties, not as of the date when it was perfected as against the claims of creditors.

 Our reasoning, so far, has proceeded on the assumption that at the time of the delivery of the bonds to Gohen on November 25, 1931, the creation of a lien upon them would have constituted a preference forbidden by the Bankruptcy Act. We are not to be understood as holding, however, that if the lien so created be judged as of November 25th, it could be condemned as preferential. The bankrupt was a man of considerable wealth and he testifies that he did not consider himself insolvent at that time, and both Gohen and the officer of the Baltimore bank testify that they considered him solvent. The fact that he was experiencing financial difficulties and that certain of his creditors were pressing for payment is not decisive of the matter. The burden rested upon the trustee in bankruptcy to satisfy the court that at the time of the transfer the Baltimore bank, or its agent acting therein, had reasonable cause to believe that it would result in a preference. Everett v. Warfield Mining Co., 4 Cir., 37 F.2d 328. As said by Judge Learned Hand in Kennard v. Behrer, D.C., 270 F. 661, 664, "That creditor only the statute proscribes who dips his hand in a pot which he knows will not go round." No such finding was made by the referee; and the judge, without finding the facts, merely enumerated the elements of a voidable preference and followed this by the statement that he believed all of the elements were present and that the transfer to the trust company amounted to a voidable preference. If, therefore, we regarded November 25th as the crucial date, we should feel impelled to remand the case for a finding on the questions of fact involved; but, as we have reached the conclusion that the lien rests upon the agreement made more than four months before bankruptcy, any inquiry as to the condition of bankrupt's affairs on November 25th becomes immaterial.

 The question arises whether the lien created with respect to the fund is not avoided by the registration laws of West Virginia requiring the registration of liens and mortgages as against creditors. It is suggested that to recognize the agreement of March 4th as creating a lien upon the fund to be derived from the sale of the property is equivalent to recognizing a lien upon the property itself; and that such a lien is void as against creditors unless recorded. The statutes of West Virginia, however, do not avoid an unregistered conveyance as between the parties (Atkinson v. Miller, 34 W.Va. 115, 11 S.E. 1007, 9 L.R.A. 544); and the trustee in bankruptcy takes no better title to the property of the bankrupt than the bankrupt himself had, and takes it subject to equities that might be asserted against him. Thompson v. Fairbanks, 196 U.S. 516, 526, 25 S.Ct. 306, 49 L.Ed. 577; Zartman v. First Nat. Bank, 216 U.S. 134, 138, 30 S.Ct. 368, 54 L.Ed. 418; Wiltshire v. Warburton, 4 Cir., 59 F.2d 611. Since the 1910 amendment to the Bankruptcy Act he has the rights of an execution creditor against property in the bankrupt's possession; but, as to other property, has no greater rights than a creditor with an execution returned unsatisfied. Southern Dairies, Inc., v. Banks, 4 Cir., 92 F.2d 282, 285. The bonds here were not in the possession of the bankrupt at the time of the filing of the petition in bankruptcy but were in the possession of Gohen, who was holding them, not simply as the agent of the bankrupt, but subject to the terms of the agreement of March 4th. His position with respect to them was that of a trustee of an express trust which a court of equity would enforce in favor of the bank. The position of a creditor of the bankrupt with an execution returned unsatisfied gives the trustee in bankruptcy no rights as against property held by a trustee under such a trust.

For the reasons stated, the decree appealed from should be reversed. This does not mean, of course, that the bonds go to the bank irrespective of the amount of its debt, but merely that it has a lien upon them as security, which is to be enforced in accordance with the familiar principles of marshalling.

 In No. 4370 the appeal to superintend and revise will be dismissed, as we are of opinion that the matter was appealable as a controversy arising in bankruptcy under Section 24a of the Act, 11 U.S.C.A. § 47 (a).

No. 4370 Appeal dismissed.

No. 4386 Reversed.

SOPER, Circuit Judge (dissenting).

The promise of Smith to pay the debt due by him to the Union Trust Company of Baltimore out of the proceeds of any sale of his property, did not give rise to a lien upon the property because it was not thereby placed beyond his control. Such a promise does not create a lien. Lone Star Cement Corp. v. Swartwout, 4 Cir., 93 F. 2d 767, and cases cited; see, also, In re Interborough Consolidated Corp., 2 Cir., 288 F. 334, 32 A.L.R. 932; Long v. Farmers' State Bank, 8 Cir., 147 F. 360, 9 L.R. A.,N.S., 585. So much is admitted; but it is said that when the property was sold, and the proceeds came into the hands of Gohen, whom Smith had sent to New York to receive them, a lien upon the proceeds arose because they were not then under the unfettered dominion and control of Smith.

This statement proceeds upon a mistaken view of the circumstances of the case. The fact is that Smith did not lose control of the proceeds of the sale until the sheriff took them from the possession of Gohen on November 25, 1931, immediately after the sale. The power of attorney to sell the property, which Smith had given to Gohen on November 18, 1930, had been revoked with Gohen's express consent on April 16, 1931, six months before the sale took place. In the meantime, Smith had resumed charge of the negotiations for the sale, had sold the property himself, and had sent Gohen to New York to deliver the executed deed and receive the proceeds of sale in his stead. Even then, as the undisputed evidence shows, Gohen did not have authority to deliver the deed until he was authorized by a telephone message on the day of sale from Smith's attorney in Huntington to do so. The legal situation was precisely the same as if Smith had gone to New York in person to consummate the transaction. He retained control until the end.

It is suggested that although Smith had control of the situation up to the moment that the bonds were delivered to Gohen, thereupon he lost it by reason of the previous promise which he and Gohen had made to the bank. This promise is spoken of as an agreement with the bank; but this is incorrect, for there was no correlative promise on the part of the bank to wait for its money until the property was sold, and Smith was at liberty to withdraw his promise at any time before the sale. The bank only gave a brief extension of the indebtedness to April 6, 1931, when the loan

was put upon a demand basis, so that the bank on its part was free at any time thereafter to put the note in suit and sell the collateral. The bank, however, did wait until the sale took place. Whether it was moved by friendship for Smith and the Huntington Bank, with which its relations were very close, or by the well grounded fear that it would be difficult in that period of financial stress to sell 1600 shares of stock of the Huntington Bank to advantage, is immaterial. Having waited until the appointed time, the Baltimore bank could rightfully say that it had accepted Smith's offer, and was entitled to the performance of his promise. But still there was no lien. The argument returns to the starting point. If a promise or an agreement to pay a debt out of a fund does not create a lien, obviously a breach of the promise cannot have this effect. Such was the decision of this court in Lone Star Cement Corp. v. Swartwout, supra, where the creditor continued to ship goods to the debtor upon his promise to pay the debt out of a certain fund; and the decision in B. Kuppenheimer & Co. v. Mornin, 8 Cir., 78 F.2d 261, 101 A.L.R. 75, where credit was extended to the debtor in consideration of a promise to pay the debt out of the proceeds of a sale of real estate. See, also, Hibernian Banking Ass'n v. Davis, 295 Ill. 537, 129 N.E. 540.

The fact that Gohen was also a party to the transaction does not alter the application of the established rule. His participation did not cause the transaction to amount to an appropriation of the fund to the payment of the debt. The situation is not like that which often obtains in the creation of an assignment, that is, it did not consist of an order or notice addressed by a debtor to a third person to pay over to the creditor funds or credits of the debtor in the third person's control, whereby an appropriation takes place and title to the fund passes to the creditor. Gohen did not occupy the position of such a third person. He was merely the agent of Smith to collect the money and pay it to the bank. As we have shown, Smith kept control until the end, and he would have violated no contract right of Gohen, or of the bank, if, instead of sending Gohen, he had gone to New York himself to collect the proceeds of the sale. Gohen himself recognized that he was subject to Smith's direction, for in a letter of August 16, 1931, to the bank, he stated that he was authorized to

pay the debt out of the proceeds of the sale "provided he should be disbursing agent." It is no answer to say that even if Smith had the power to revoke Gohen's authority, he did not exercise it; for possession of the power to revoke signifies that unfettered dominion over the fund which is incompatible with the existence of a lien.

The authorities support the view that the designation of an agent by the debtor does not alter the general rule. For instance, the Supreme Court of Appeals of Virginia, whose decisions on the subject are cited with approval in Arnold v. Buckhannon Bank, 116 W.Va. 589, 183 S.E. 52, considered the precise question in Hicks v. Roanoke Brick Co., 94 Va. 741, 27 S.E. 596. A contractor, engaged in carrying on certain work under a public contract, wrote to his bank with reference to an account due one of his creditors, saying: "Out of my estimates which you will collect from the City of Roanoke, you will please settle the above account either in cash or city warrants as you may receive them; this assignment being intended to embrace said fund after the payment of the sums necessary for the current expenses of the work." The court held that the writing did not give an equitable lien on the fund or operate as an equitable assignment, in view of the fact that it was not drawn on a debtor of the drawer, or on any person holding·funds belonging to him, and did not place the fund or any part of it in the control of the payee. For a similar decision see Rodick v. Gandell, Ch. 1849, 12 Beav. 325, affirmed C.A. 1851, 1 DeG., M. & ·G. 763.

In Lone Star Cement. Corporation v. Swartwout, 4 Cir., 93 F.2d 767, this court had occasion to point out that since Christmas v. Russell, 14 Wall. 69, 20 L.Ed. 762, the leading case on the effect of a mere promise to pay a debt out of a fund when received, the Supreme Court has held that an equitable lien is created when the intention to do so is manifest from particular circumstances, as in an agreement between attorney and client that the fee of the attorney shall be paid out of a fund to be collected by him. See Barnes v. Alexander, 232 U.S. 117, 34 S.Ct. 276, 58 L.Ed. 530, and other cases cited. But the special circumstances of these decisions were stressed, and we expressed our approval of the views of Professor Williston on the subject in these words (93 F.2d at page 770)·: "Professor Williston points out that a valid assignment is created by an agreement au-

thorizing an attorney to collect the fund and pay himself by retaining his fee; but only a contract right is effected if the fund is to come into the hands of the client and he is to make the payment; and that whether such a right, though not amounting to an assignment, gives rise to an equitable lien is substantially the same question that arises whenever there is a contract to transfer in the future personal property not ordinarily the subject of the specific performance. We are in accord with his suggestion that the decision of the question involves the propriety of subordinating general creditors to a variety of equitable liens created by contracts referring to specific property, and that there seems to be no reason to distinguish promises to pay money from a specific fund when received from promises to deliver specific goods when manufactured."

It is worth while in passing to note that in the pending case, Smith not only promised to pay his debt to the bank out of the proceeds of the sale of the property, but also made similar subsequent promises to other creditors, and gave like orders to Gohen with respect thereto. This fact is important not merely because it has a bearing upon the general equity of the claim of the bank to priority over other creditors, but because it negatives an intention on Smith's part to impose a specific lien upon the fund.

. The pending case must be decided according to the law of West Virginia. This would have been true even if Erie Railroad Company v. Tompkins, 302 U.S. 671, 58 S. Ct. 50, 82 L.Ed. 518, had not given new vigor to the binding force of State decisions. Lone Star Cement Corp. v. Swartwout, 4 Cir., 93 F.2d 767, 770. It is therefore important to note that even if the federal courts have broadened the strict requirements of Christmas v. Russell, 14 Wall. 69, 20 L.Ed. 762 (see B. Kuppenheimer & Co. v. Mornin, 8 Cir., 78 F.2d 261, 264, 101 A. L.R. 75), such is not the case with the Supreme Court of West Virginia. That court has recently refused to follow such decisions as Barnes v. Alexander, 232 U.S. 117, 34 S.Ct. 276, 58 L.Ed. 530, insofar as they may seem to depart from the earlier rule, as is shown by the following quotation from Arnold v. Buckhannon Bank, 116 W.Va. 589, 183 S.E. 52. In that case the court was called on to pass upon the claim of a creditor to prior payment out of a designated fund. The plaintiff had lent money

to a bank to be applied to the payment of interest on notes for which he was not responsible; and the bank agreed to repay him the advances out of the first money it received on the notes from the makers, or from a sale of the makers' property. The court held that this was a mere agreement that the debt should be paid out of a designated fund when received by the debtor and was not an assignment of and created no equitable right to the fund. Commenting on the differences on the subject that have arisen in the federal courts, the Supreme Court of West Virginia had this to say: "There is some difference of authority on a situation like this, occasioned mainly by the fluctuation thereon of the federal courts. For demonstration of this statement, see the several holdings in Christmas v. Russell, 14 Wall. 69, 20 L.Ed. 762; In re Stiger (D.C.) 202 F. 791; Barnes v. Alexander, 232 U.S. 117, 34 S.Ct. 276, 58 L. Ed. 530; In re Interborough Consol. Corp. (C.C.A.) 288 F. 334, 32 A.L.R. 932; East Side Packing Co. v. Fahy Market (C.C.A.) 24 F.2d 644. The Virginia courts, however, are committed to the rule that to constitute an equitable assignment, the debtor must by order or otherwise place the creditor in position to compel payment of the debt from the holder of the fund; and that a mere agreement between debtor and creditor that the debt should be paid out of a designated fund, when received by the debtor, is not an assignment of and creates no equitable right to the fund. Clayton v. Fawcett's Adm'rs, 2 Leigh (29 Va.) 19; Eib v. Martin, 5 Leigh (32 Va.) 132; Feamster v. Withrow, 9 W.Va. 296, 313; Smith v. Patton, 12 W.Va. 541, 553. This rule is supported by the great weight of authority. 5 C.J., subject Assignments, section 80; 19 A. & E. Ency. of Law, subject Liens, pp. 16, 17; Williston on Contracts, §§ 428, 429; Jones on Liens (3d Ed.) § 48; Lawrence on Eq. Juris., § 235; Pomeroy's Eq. Juris. (4th Ed.) § 1283, note 1; Beach on Modern Eq. Juris., § 333; Bispham's Principles of Eq. (7th Ed.) § 167. In Evans v. Rice, Trustee, 96 Va. 50, 30 S.E. 463, it was expressly held: 'An agreement by a debtor to pay a debt out of the proceeds of the sale of a particular piece of property does not constitute an assignment of, or lien upon such proceeds, but is only the personal covenant of the debtor.' Accord: American Pin Co. v. Wright, 60 N.J.Eq. 147, 149, 46 A. 215, 216, in which Vice-Chancellor Pitney said of a promise under

seal of a debtor that he would devote the proceeds of the sale of his house to payment of a certain debt: 'I have been unable to find any authority which has gone so far as to hold an agreement of this kind to amount to a charge.'"

This controlling rule should be applied in the pending case, and the judgment of the District Court should be affirmed.